THOMAS FOWLER V. L. E. HULTS.

No. 7855. Decided April 22, 1942.
(161 S. W., 2d Series, 478.)

*Arthur Haddaway,* of Fort Worth, for plaintiff in error.

Leases, and work incidental to securing same, made by party employed by defendant on land selected by the defendant

are not within the scope of the Texas Securities Act. Lefevre v. Whittier & Co. 84 N. H. 105, 146 Atl. 527.

*Tuohy & Crager*, of Fort Worth, for defendant in error.

MR. PRESIDING JUDGE SMEDLEY delivered the opinion of the Commission of Appeals, Section B.

Plaintiff in error Fowler sued defendant in error Hults for $910.99, alleging that by oral contract he was employed by Hults to obtain for him from the owners of five tracts of land in Kent County the execution of oil and gas leases on their land and that Hults agreed to pay him for procuring the leases ten cents per acre; that he did procure the leases and Hults, in violation of his agreement, refused to accept them and failed and refused to pay the agreed compensation.

The defense specially pleaded by Hults were, first, that the alleged contract had not been performed by Fowler in that he did not submit abstracts of title showing good titles in the land owners and second, that the alleged contract was illegal and unenforceable because it was in contravention of the Texas Securities Act, Fowler being a dealer or broker in securities and not having complied with the licensing provisions of the Act. Chapter 100, Acts Reg. Session, 44th Legislature; Vernon's Ann. Civ. State., Article 600a; Vernon's Annotated Penal Code, Article 1083a.

The jury in answer to special issues found that the agreement of Hults to pay Fowler ten cents per acre was not dependent upon the furnishing of abstracts showing marketable titles to the leases, that Hults did not refuse to accept the leases because abstracts showing marketable titles were not delivered to him, and that Fowler was not a dealer in securities. The Court of Civil Appeal reversed the trial court's judgment in favor of Fowler for $910.99 and rendered judgment that Fowler take nothing by his suit, holding, on the authority of Kadane v. Clark, 135 Texas 496, 143 S. W. (2d) 197, that the contract sued upon, measured by the terms of The Securities Act, was a contract for dealing in securities and that Fowler, not having registered as required by the Act, could not recover compensation for the services performed by him. 148 S. W. (2d) 249.

Hults filed a motion for instructed verdict on the ground that the undisputed evidence showed that Fowler, in obtaining

and delivering the oil and gas leases, was dealing in securities in such manner as to constitute him a dealer under The Securities Act, and that he had not registered as required by that Act. The same point was thereafter made in a motion for judgment notwithstanding the verdict. Hults made no objections to the issues submitted to the jury and no request for the submission of other issues. By his brief in the Court of Civil Appeals Hults, as appellant, presents only questions of law. No contention is made in the brief that any fact finding made by the jury, or that may be implied from the trial court's judgment, is not supported by evidence. By one proposition it is submitted that the fifth special issue, in answer to which the jury found that Fowler was not a dealer in securities, is immaterial because it presents a question of law. The substance of the other three propositions is the same as that of the motion for instructed verdict, viz., that according to the undisputed evidence the contract was for selling or dealing in securities, oil and gas leases, and that Fowler cannot recover for his services because he had not registered as a dealer.

Fowler lived at Jayton, in Kent County, and was secretary-treasurer of the Jayton National Farm Loan Association, made up of land owners who borrowed money from the Federal Land Bank at Houston. To that business he devoted about ninety per cent of his time. He was engaged also in real estate business and insurance business. Hults resided in Fort Worth. He described his occupation as that of general independent oil operator and dealer in securities.

The two parties, Fowler and Hults, were the only witnesses. While the testimony of one contradicts that of the other as to what was said in their preliminary negotiations and the manner in which they were begun, there are, except in relation to the obligation to furnish abstracts of title, no material contradictions in their testimony about the terms of the oral agreement and what was done by Fowler under the agreement.

It was agreed by the parties that Fowler should procure the execution by the owners of certain tracts of land of oil and gas leases to Hults as lessee for a consideration of $1.00 per acre to be paid the land owners and deposit the leases with escrow contracts in a designated bank in Fort Worth, for delivery to Hults after he had approved the title and made payment of the consideration to the bank for the credit of the lessor, and that Hults should pay to Fowler for his services or

as his commission ten cents per acre in addition to the $1.00 per acre to be paid the land owners. Hults testified that it was agreed that Fowler should "get up" abstracts of title and deliver them with the leases, while Fowler testified that when he was employed by Hults to procure the leases nothing was said about title to the properties and that his employment was not conditioned upon the furnishing or making of satisfactory titles.

Fowler procured the execution of the leases and caused them to be deposited in the bank with escrow contracts signed by the land owners and signed and acknowledged also by Hults. Each of the contracts provided that the lessor should furnish an abstract of title to be examined by the lessee and that if in the opinion of lessee's attorney the fee title was good in the lessor, the lessee should accept the lease and make payment of the consideration. The leases remained in the bank for several months. Hults did not approve the titles and did not accept the leases, and the leases were returned by the bank to the land owners.

The record contains testimony about difficulties in obtaining the abstracts, which were in the possession of the Federal Land Bank, and about steps taken to obtain agreements from the land bank subordinating its liens to the leases, but that evidence became immaterial when the jury found that the agreement of Hults to pay Fowler ten cents per acre was not dependent upon furnishing abstracts showing marketable titles to the leases.

The substance of Hults' testimony as to what was said in the preliminary negotiations between him and Fowler and the manner in which the negotiations were begun is as follows: Fowler, with whom he had never theretofore communicated by telephone or by any other means, came to his office in Fort Worth, introduced himself and said he lived in Jayton and understood that he, Hults, was interested in purchasing leases in that country. Fowler submitted "some acreage out there," wanting to know whether he would be interested in it. He said that he "controlled" the acreage "or could get it." "Fowler wanted to sell these leases." The land submitted was that covered by the leases that later were deposited in the bank at Fort Worth. They discussed the price to be paid for the leases and what it would be worth to Fowler "to handle this acreage, what he was going to get out of the deal." Fowler said ten cents

an acre would suit him and he agreed to it, making the acreage cost him, Hults, $1.10 per acre. He and Fowler agreed "on ten cents as. a commission." Fowler "was to contact these people, set up the leases and furnish me abstract of title; and that was his part of the selling of the leases to me, that was what he was to do to earn the ten cents."

Fowler's testimony as to the beginning of the negotiations and what was said and done is in substance as follows: He wrote Hults, telling him he had heard that he was leasing land in Kent County and that "if he would be interested in some more I would like to get some more for him." Thereafter Hults called him by telephone and asked him whether he could get a lease on the York land and he told Hults he believed he could. They discussed the price to be paid for the lease and he told Hults he believed he could get it for $1.00 an acre "on a commission basis." Hults asked him whether he could get his commission from the land owner and he told him he could not. Hults asked him "what will you charge me to get the lease?" "I told him ten cents an acre" and Hults agreed to it and instructed him to go out and get the lease.

He induced York to execute the lease, took it to Fort Worth and with Hults placed it in the bank with a contract for its delivery executed by York and Hults. He and Hults discussed further leases. He had a map with him and showed Hults leases that he could get in the same vicinity and Hults pointed out the particular land that he would take. It was agreed that he should procure leases on that land on the same terms and for the same compensation as the York lease. He did not "put up to Mr. Hults any leases besides those which he asked for." He went to see the land owners, told them that he had an oil man in Fort Worth who would lease their land for $1.00 per acre and explained to them that he would be paid by the lessee a commission of ten cents an acre. These leases were executed and, with escrow contracts like that accompanying the York lease, were placed in the bank. He testified that the agreement was that for the ten cents per acre he was "to get the leases" and that he procured the execution of the leases and assisted in making the escrow contracts and in getting abstracts because he was trying to make ten cents an acre. When asked on cross examination whether he was representing the land owners, he answered: "I would be representing them in a way; I had to contact them." He testified further that he did not think he was trying to sell the leases, that he was going to get

so much money for obtaining them for Hults, and that he thought he was working for Hults.

The testimony of Hults tends, we believe, to prove that Fowler, although he was to be paid a commission by Hults, was representing the land owners in endeavoring to bring about the acceptance by Hults of oil and gas leases on their lands for a cash consideration of $1.00 per acre to be paid them by Hults. Fowler's testimony makes him the representative or employee of Hults, for compensation measured by ten cents per acre, to procure for him the execution and delivery of oil and gas leases on certain tracts of land selected and designated by Hults. Defendant in error Hults contends that Fowler was selling, offering for sale, or attempting to sell to him the oil and gas leases executed by the land owners and that in so doing he was acting as a dealer or salesman selling or offering securities for sale without having registered as required by The Securities Act. Plaintiff in error Fowler takes the position that he was not a seller of securities or a dealer in them under the terms of The Securities Act, but that he was lawfully employed by Hults to assist him in buying the leases, that is, to solicit and obtain the execution by the land owners of oil and gas leases in favor of Hults, a willing purchaser who himself selected the land to be leased.

In our opinion, the jury's answer to special issue No. 5 determined the issues of fact raised by the testimony of Fowler and Hults with respect to the nature of the services performed by Fowler and his relation to the lessors and the lessee Hults. The issue is subject to the objection that it submits a mixed question of law and fact, but no objection was made to it. The accompanying definition, the issue and the answer made by the jury are as follows:

"THE TERM 'DEALER' shall include every person or Company other than a salesman who engages in this state either for all or part of his or its time directly or through an agent in selling, offering for sale, or delivery, or subscriptions to, or orders for, or undertaking to dispose of or to invite offers for, or dealing in any other manner in any security or securities within this state. You are charged that an interest in an oil and gas lease is security within the maining of the foregoing definition. Bearing in mind the above definition you will answer the following question:

"SPECIAL ISSUE NO. 5: Do you find from a preponderance of

the evidence that the plaintiff Thomas Fowler was a dealer in securities? Answer yes or no.

"ANSWER: No."

The definition is copied from Subdivision (c) of Section 2 of The Securities Act, with the added charge that an interest in an oil and gas lease is a security. When the jury answered "No" to the question whether Fowler was a dealer, thus defined, it found that he was not engaged in selling the leases or offering them for sale or undertaking to dispose of them, and in effect found that he was acting for Hults in procuring the execution of the leases, that is, buying them rather than selling them.

In view of the jury's verdict, it is unnecessary to decide, and we do not decide, whether Fowler would have been a dealer in securities within the meaning of the statute, had he been representing the land owners in an effort to induce Hults to accept and pay for oil and gas leases from the land owners as lessors to Hults as lessee. In this case the oil and gas leases had not been executed when the negotiations between Fowler and Hults were begun. The plaintiff in Kadane v. Clark, 135 Texas 496, 143 S. W. (2d) 197, and the accused in Atwood v. State, 135 Texas 543, 121 S. W. (2d) 353, were engaged in finding purchasers for existing leases or interests in existing leases. We merely note the difference in the facts without expressing an opinion as to its significance.

The record in the case presents this controlling question: Was Fowler, in his employment by Hults to procure for him the execution and delivery of oil and gas leases from the land owners to Hults and in the services performed by him in that employment, a dealer in securities required to register as such under the provisions of The Securities Act?

Enacted in 1935 to take the place of the "Blue Sky Law of Texas," which was not deemed sufficiently effective, The Securities Act is a very elaborate statute intended as a "more efficient and effective means of preventing fraud in the sale of securities." The Court of Criminal Appeals, in Atwood v. State, 135 Texas Crim. Rep. 543, 121 S. W. (2d) 353, 355, said of the Act:

"It is designed to protect the public against the frauds of those engaged in selling securities which represent nothing substantial."

This court, in Kadane v. Clark, 135 Texas 496, 501, 143 S. W. (2d) 197, said:

"Clearly the outstanding purpose of this Act is for the protection of the public. Its object is to regulate the sale of securities and to protect the public from fraud and imposition by those engaged in selling worthless securities."

The statements in the opinions of the two highest courts of the state that the statute is intended to regulate the sale of securities and to protect the public against the frauds of those who sell them are well supported by the language of the Act, and particularly by the repeated use of the words "sell" and "sale" throughout the entire Act, including the caption and the emergency clause. Sellers and sales are regulated and purchasers are protected against sellers. The Act does not undertake to regulate purchasers or to protect sellers against purchasers.

The Act thus defines dealer:

"The term 'dealer' shall include every person or company, other than a salesman, who engages in this State, either for all or part of his or its time, directly or through an agent, in selling, offering for sale or delivery or soliciting subscriptions to, or orders for, or undertaking to dispose of, or to invite offers for, or dealing in any other manner in any security or securities within this State." Subdivision (c), Section 2.

It is provided by Section 5 that no dealer or salesman "shall sell or offer for sale any securities issued after the passage of this Act," except certain exempted securities, until the issuer shall have been granted a permit by the Secretary of State. By the terms of Section 12 "no person, firm, corporation or dealer, shall directly or through agents or salesmen, offer for sale, sell or make a sale of any securities in this state without first being registered as in this Act provided." The sworn application required to be filed by a dealer desiring to register must contain, among other requirements, information "to enable the Secretary of State to determine whether the sale of any security proposed to be issued or dealt in by such applicant would be fraudulent or would result in fraud." Section 13. The Secretary of State may require a dealer to file with him a list of securities "which he has offered for sale or has advertised for sale within the state during the preceding six months." Section

24. By Section 30 of the Act, which is Article 1803a of Vermon's Annotated Penal Code, it is provided that:

"Any dealer, agent, salesman, principal, officer, or employee, who shall, within this State, sell, offer for sale or delivery, solicit subscriptions to or orders for, dispose of, invite offers for, or who shall deal in any other manner in any security or securities, without being registered as in this Act provided, or who shall within this State, sell, offer for sale or delivery, solicit subscriptions to and orders for, dispose of, invite orders for, or who shall deal in any other manner in any security or securities issued after the effective date of this Act without having secured a permit as herein provided, * * * * * * shall be deemed guilty of a felony, etc."

All the provisions of the Act above quoted and referred to relate to sales and sellers of securities and not to purchasers or buyers. Nowhere in the Act is there any language which might be construed as disclosing an intention to require purchasers of securities to register or to prohibit one from buying securities without registering, unless it is the words "or dealing in any other manner in any security or securities" in the definition of the term "dealer" in subdivision (c) of section 2, and substantially the same phrase in section 30 above quoted.

A dealer is defined as a person "who engages in this State * * * in selling, offering for sale or delivery or soliciting subscriptions to, or orders for, or undertaking to dispose of, or to invite offers for, or dealing in any other manner in any security or securities in this State." The phrase "or dealing in any other manner" is one of general words following particular and specific words all of which relate to selling or undertaking to sell, and under the rule of ejusdem generis must be held to include only acts or activities of the same kind as those specifically enumerated, there being no clear manifestation in the Act of a contrary purpose. Farmers & Mechanics Nat'l Bank v. Hanks, 104 Texas 320, 324-327, 137 S. W. 1120, Am. Cas. 1941B, 368; Thomas v. State, 129 Texas Crim. Rep. 628, 91 S. W. (2d) 716. Had the Legislature intended to require buyers of securities to register, its intention would, or certainly in a penal Act should, have been manifested more clearly than by the use of the word "dealing" following particular and specific words all relating to selling.

If the plaintiff in error Fowler as a condition precedent

to the performance of the services for which he was employed by defendant in error Hults, procuring the execution of the oil and gas leases by the land owners, were required to register as a dealer under The Securities Act, then any person employed by an oil company, or other prospective lessee, to obtain or assist in obtaining oil and gas leases from land owners would be required to register as a dealer in securities before entering upon the performance of his duties. There is in our opinion no language in the Act to justify that construction of it and that construction is not necessary to the accomplishment of the declared and obvious purpose of the statute.

We express no opinion as to what may be the effect of the amendments made to The Securities Act by the Forty-seventh Legislature. Acts Reg. Sess., 47th Leg., 1941, Ch. 363, p. 593. The transactions out of which this suit arose were completed long before the amendments were enacted.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Opinion adopted by the Supreme Court April 22, 1942.