**Edmond L. BROWN, Appellant,**

v.

**Harold G. COLE et al., Appellees.**

**No. 14887.**

Court of Civil Appeals of Texas.

Dallas.

Feb. 11, 1955.

Rehearing Denied March 18, 1955.

Golden, Croley, Howell, Johnson & Mizell, and John L. Roach, Dallas, for appellant.

Douglas E. Bergman, Davidson & Silverberg and Philip Silverberg, Dallas, for appellees.

YOUNG, Justice.

Appellees Cole and Gould sued Beer & Company, a copartnership, and Edmond L. Brown, its employee, for recovery of the sum of $10,000 with legal interest, representing an expenditure of $5,000 by each plaintiff allegedly for securities sold to them by defendants in violation of the Texas Securities Act, Art. 600a, Vernon's Ann. Civ.St. It was claimed that Brown was acting as the duly authorized agent of Beer & Co., or, alternatively, in his individual capacity and as such was a "dealer" within the terms of the Act; invoking in particular, sec. 33a, providing in part: "Every sale or contract of sale of any security made in violation of any provision of this Chapter shall be voidable at the election of the purchaser, who shall be entitled to recover from the seller in an action at law, upon tender to the seller of the security sold, in proper form for transfer, together with the amount of all dividends, interest, and other income and distributions received by the purchaser from or upon such security, the full amount paid by such purchaser for such security, with interest from the date of purchase; * * *."

At close of testimony the court called upon the parties for submission of fact issues, with none suggested; and thereupon withdrew the case from the jury without objection; entering judgment in favor of plaintiffs against defendant Brown in amounts sued for, but that they take nothing against Beer & Company. From this judgment, also order overruling his exceptions and motion for instructed verdict, defendant Brown alone has appealed.

The background, nature, and relationship of parties to this controversy require a rather lengthy detail of facts,· and we draw freely from appellant's brief for statement thereof; his primary contention being that the Securities Act is in no wise applicable to the matters hereinafter related.

Beer & Company is a brokerage concern principally engaged in buying and selling stocks for customers and occasionally acting as an underwriter, with offices at 201 Gulf States Building, Dallas. Murray Samuell was resident partner of the Company, managing the office there. Beer & Company was duly registered as a dealer and its employee Brown licensed as a securities salesman under general requirements of the Texas Securities Act; the latter having been so employed from 1947 to January 1953; at time of trial (February 1954), a partner in Garrett & Company, a local investment house. Both Murray Samuell, defendant Brown and other employees of Beer & Company were not prohibited from engaging in private transactions and investments. Plaintiffs Cole and Gould were Dallas businessmen and frequent customers of Beer & Company, with Gould in the Company office almost daily, their account handled by Edwin Sanger, another salesman. Gould, Brown and other persons had tentatively joined in a previous Mexican venture known as the Peridero or Pacific Metals and Minerals deal, but the same not materializing, Gould had been returned his cash investment. Defendant Brown had no prior business relations with Cole and in fact did not know him.

The transaction resulting in the present lawsuit took place in July 1952 and involved mining properties in the Republic of Mexico owned and operated by one Howard Fields. Wm. G. Kane, who lived or spent much of his time in Mexico, had submitted the proposition in question to Brown and his employer Samuell earlier in that spring—such· transaction being hereinafter referred to as the Kane-Fields or Industrial Ores deal. In brief outline, it was that the named Howard Fields needed additional cash for his mining operation and that in exchange for a loan of some $30,-000 he would sign over one-fourth of his enterprise, conducted as a sole proprietorship. It was contemplated that a corporation known as Carbo Minera would be formed into which the Fields properties would be transferred; that another company known as the Industrial Ores de Mexico would be incorporated to hold one-fourth of the stock of Carbo Minera; that a number of individuals would go into the deal, and, for each $5,000 loaned, the investor would get a one-eighth interest in Industrial Ores stock. Kane, Fields, and the attorneys in Mexico were to handle the details of incorporation, issuance of stock and related matters. Kane was a geologist and engineer and on retainer for the Ohio-Mexico Oil Corporation which, in turn, was owned by a corporation of which Brown was a Director. They had jointly been interested in previous investments. Murray Samuell and Stuart Wyeth were also acquainted with Kane and had knowledge of the immediate project, both taking a $5,000 interest in the venture by cash payments in June 1952. Similarly, Ivey-Brown Co., a copartnership composed of Frank Ivey and defendant Brown, had paid in $5,000. It was agreed that Brown should handle the money, that is, accept it from participants and forward to Kane in Mexico; Brown to maintain such an account in his own name as agent at a Dallas Bank. Shortly after making his investment, Murray Samuell, and others then interested, suggested that a statement be furnished them concerning the deal, in nature and outline; whereupon, prior to June 22 a memorandum was prepared, styled: "Re: Carbo Minera, S. A. Howard Fields Property".[1]

I. This memorandum contained information received by Brown from Kane and his Mexico lawyer and is here quoted as plaintiffs' Exhibit 1:

"Property: Howard Fields built a mill for concentrating lead and zinc at Carbo, Sonora, Mexico, August 1951, and spent approximately $150,000. Next to this property is a farm-out he secured from the American Smelting & Refining Company. American Smelting has loaned Mr. Fields $25,000 which is payable out of

Later in June 1952, while Gould was in the office of Beer & Company, Brown advised him of the Kane-Fields project, explaining it; and either at their first or second discussion of the subject, the latter was furnished a copy of Exhibit 1, Gould then telling Cole about the proposition, who asked for the memorandum (Exhibit 1) and

certain percentages of the gross returns of the concentrates.

"This is a complete modern concentrate plant; for an inventory of his primary equipment see enclosure No. 1.

"Mr. Fields also owns the claims adjacent to this property and has sufficient high grade ore on hand in his properties and American Smelting & Refining Company's farm-out to run many years.

"Present Finances:

"At the present time in a 25 day month, his runs are approximately 125 tons of lead concentrates and 360 tons of lead zinc concentrate, a total value of approximately $34,268. Out of this return, he is paying American Smelting & Refining Company $9,700 per month and is paying some private loans about $8,000 a month. These payments with the cost of about $10,000 a month for production costs, leaves him with such a small margin for operating capital that he is unable to expand his production and adequately keep sufficient working capital on hand. It takes approximately three months to get returns after the concentrates are shipped.

"For a loan of $30,000, Mr. Fields has agreed to pay a certain percentage of the gross receipts from the concentrates over and above the part obligated to repay American Smelting. This percentage amounts to about $31,650 in 6 months.

"After studying reports sent by Mr. Fields, William G. Kane proceeded to Carbo, Sonora and checked every detail of the mill and properties and after considering all possibilities stated that the loan appeared to be well secured and absolutely safe. In order to secure this loan, Mr. Fields offered to convey ¼ of his Corporation which is Minera Carbo, S. A., capitalized at 200,000 shares, 10 peso per each as a bonus for receiving this loan. He further gave an option for 4 months to Mr. Kane to purchase a second ¼ interest for $30,000.

"In order to implement this project the Dallas group has loaned Mr. Kane $30,000 for 6 months at 5%. Mr. Kane has formed a corporation called Industrial Ores de Mexico with a capital of 30,000 shares, 1 peso par common, 270,000 preferred, 1 peso par, capital variable; ⅞ of the stock of this corporation will be put in escrow for the benefit of the Dallas Associates and ⅛ will go to Mr. Kane

which was our agreement with him when we asked him to take over this project. Mr. Kane will make the $30,000 loan to Mr. Fields' corporation, Carbo Minera. Carbo Minera will immediately convey 25% of its stock to Industrial Ores de Mexico and the balance of 75% common stock will be placed in escrow in a bank to secure the $30,000 loan. Mr. Fields will receive a salary of $500.00 per month until the indebtedness has been paid and the Corporation will be required to keep a minimum of $15,000 working capital in hand. Mr. Kane has the right to take over Carbo Minera any time the monthly payments on this loan are in default.

"Mr. Kane has investigated this property through American Smelting & Refining. He has examined the run sheets and it appears this loan can be repaid in 6 to 7 months with an adequate margin of safety.

"Fausto Miranda of Baker, Botts, Miranda & Prieta, our attorneys, called from Mexico City June 20 and stated that he had investigated the Fields' property through American Smelting & Refining and had worked out all corporation details on both corporations and to him the project appeared to have substantial safety and excellent prospects.

"$15,000 has been forwarded to Mr. Kane to implement this project and his further requirements are $5,000 June 25; $5,000 July 1, $10,000 July 15.

"We plan to send Mr. Kane a total of $35,000. This will leave an excess of $5,000 in the Industrial Ores de Mexico, for legal and other expenses. This money is a loan and will come back to the Dallas Associates tax-free.

"We have placed Mr. Kane on a retainer of $1,000 per month and all his services will be for the benefit of Industrial Ores de Mexico; the ⅞th of Industrial Ores will go (to) the Dallas Snydicate on the ratio of ⅛th for each $5,000.

"Mr. Kane will supervise the Carbo operation, collect and bank the funds each month.

"All fees for services performed by Mr. Kane or interests in properties received by him for services after the formation of Industrial Ores de Mexico will be for the benefit of Industrial Ores de Mexico.

"After the $30,000 is returned and all indebtedness is paid, the property should pay approximately $4,000 to $5,000, monthly to the ¼th interest."

same was mailed to him by Gould; Cole calling in Irving H. Bloch, a certified public accountant, to look into the matter, the two conferring about it. Gould then took Bloch and Cole to see Brown in Beer & Company's office; Cole testifying that he was merely introduced to Brown, not joining in or listening to the ensuing conversation, and in fact that he did not personally talk to Brown about the deal at any time before putting up his check, having left all such matters to Bloch, his accountant. About July 26, 1952 Bloch and Brown went to Mexico City for further investigation of the Kane-Fields project at Brown's expense and request, Gould becoming interested only after Bloch's return and report; both plaintiffs testifying that they relied on Bloch's recommendation rather than the statements of Brown. While in Mexico on the trip, Bloch and defendant Brown talked with Kane, Fields, and Miranda, the attorney; at which time Industrial Ores had been organized as a corporation but Carbo Minera (to take over Fields' property) had not. Also discussed on the trip by Bloch and Brown was method of handling the deal, tax-wise, in case the named parties invested; and it was agreed that $1/10$ of any loan ($5,000 or less) would be set up as the subscription price of Industrial Ores Stock, to be retained in Mexico out of funds payable on each loan under option exercisable not later than July 1, 1953. At a meeting of Bloch, Cole and Gould on July 28, 1952, all decided to invest, Bloch coming in for $1,-250; Brown telling him to make all checks payable to "E. L. Brown, Agent," which was done, delivering them to Brown. In Bloch's letter enclosing check Brown was advised that the amounts totaling $11,250 were "to be transmitted as a loan through Mr. Kane to Mr. Fields"; Gould's check ($5,000) bearing the notation on its face "For Loan to Howard Fields through Wm. G. Kane"; and that of Cole ($5,000), "For the account of Harold G. Cole for loan to William G. Kane for the account of Howard H. Fields for Industrial Minerals de Mexico". On receipt of these checks Brown wrote identical letters to the parties just named; and here we quote the con-

tents of such writing addressed to each plaintiff: "This letter will acknowledge receipt of your check for $5,000 which will be deposited to the E. L. Brown, agent account at the Republic National Bank, Dallas, for transmittal to William G. Kane, and will in turn be transmitted to Howard H. Fields. It is understood that the loan will be repaid by Fields through Kane as promptly as is advisable. This will also make it of record with Mr. Kane that your subscription is received for $1/8$ of all authorized stock of Industrial Ores de Mexico, S.A. De C.V., and that the total stock of the Company now consists of 27,000 shares of preferred and 30,000 common— all one peso par. The total subscription cost to you will be $500 payable on or before July 1, 1953. It is mutually understood that this is for private investment purposes and that I am acting as Agent for the group. Very truly yours, /s/ Edmond L. Brown, Agent." (This letter is designated in evidence as part of plaintiffs' Exhibits 3 and 6.) Others, loosely referred to as the "Dallas Group," participating in the mentioned deal were Wyeth, Samuell, Ivey-Brown, a partnership, Orlen Nation, D. P. Echedero, and Edwin Sanger. It is not controverted that Brown promptly transmitted all monies received by him as Agent to Kane in Mexico; also that he collected no commissions and made no profits perforce of the deal, the Ivey-Brown partnership losing its $5,000 investment and Brown, personally, a further expense item of $1,200.

In September following, the parties became dissatisfied with the Mexico handling of the deal, Brown learning that the indebtedness of Howard Fields was far greater than as represented; and an inquiry initiated by Gould and Cole with Brown resulted in a Dallas conference by the three with Wm. G. Kane, when it was ascertained that additional capital stock had been authorized by Industrial Ores de Mexico and sold to a further group of stockholders; Brown in the meantime having furnished to Bloch a statement received from Kane showing the changed capital structure of

Industrial Ores [2]. In February 1953, stock certificates in the named Mexico corporation were tendered plaintiffs and declined, and such stock at that time was considered worthless; plaintiffs also assigning to defendants in pleading and testimony all their right, title and interest in and to Exhibits 3 and 6 (Brown's letter of July 29, 1952), making demand upon Brown and bringing suit for the $10,000 paid for the "securities" allegedly sold by him. Neither the memorandum which Brown prepared, nor the letters acknowledging receipt of the money, which he wrote, were filed with the Secretary of State, and the stock of Industrial Ores was not covered by a permit issued by the Secretary of State. It was further admitted that Brown was not a registered *dealer*, within the terms of The Texas Securities Act.

Defendant Brown and plaintiffs had no control or managerial authority over Industrial Ores or the proposed corporation, Carbo Minera, nor were they officers or directors in either setup. Testimony of Brown concerning his original contacts with plaintiffs (of the Dallas group) was as follows:

"Q. Now, then, Mr. Brown, this matter was originally submitted to you, or this whole deal was originally submitted to you by Mr. Kane, wasn't it? A. Yes, sir.

"Q. I mean, that is how you got into it from the start? A. Yes, sir.

"Q. And from that submission by Mr. Kane, you interested various other people who went into the deal individually; that is what happened, wasn't it? A. Well, Mr. Kane probably contacted some of them himself. He was very close to Mr. Wyeth and Mr. Samuell and very close to all of the people who were interested in this thing.

"Q. Now, with reference to Mr. Gould, Mr. Cole and Mr. Bloch, however, Mr. Kane didn't interest them in the transaction? A. No.

"Q. That was from your solicitation, wasn't it—Mr. Bloch, Mr. Gould and Mr. Cole? A. I wouldn't call it solicitation.

"Q. Well, it was from your contact and presentation of the transaction; shall we call it that? A. Yes.

"Q. Suffice it to say, the way they got in on it was through you, wasn't it? A. No, not through me.

"Q. Well, the way they first heard about it was through you, wasn't it? A. Yes.

"Q. And their entire conversations with reference to the matter were with you, were they not, with the one exception of the trip to Mexico which Mr. Bloch made with you; is that correct? A. Yes, I should say so."

The record generally reflects that appellant in the transaction in question was not authorized by or acting for Beer & Company; and a witness for the latter likewise testified without dispute that it was not engaged in offering, soliciting, or selling any sort of security involved in the Kane-Fields deal, nor had it authorized appellant to act as its salesman in such regard.

2. This statement was on stationery headed:

"Industrial Minerals De Mexico
S. A. DE C. V.
Apartado 711

"San Juan De Letran 9 No. 805     201 Gulf States Bldg.
Mexico, D. F.     Dallas, Texas, U. S. A.
Telephone – 10–27–24     Telephone–Prospect 8981";

defendant Brown in this connection testifying that the corporation Industrial Ores had placed "201 Gulf States Building, Dallas, Texas, U. S. A." on its letterheads without his knowledge or authority.

Appellant's series of points (some differently numbered for convenience) complain of the trial court's error: (1) "in holding that plaintiffs were entitled to recover of the defendant Brown; because the undisputed facts showed that the Securities Act was not applicable to the transaction and, therefore, no cause of action arose under sec. 33a thereof"; (2) "in holding that there was either a sale or contract of sale; the undisputed proof showing that the plaintiffs were not purchasers from the defendant Brown, but rather were purchasers along with him, of and from a third party; or that they joined together in making a loan to a third party"; (3) "in holding that there was a sale or contract of sale; the undisputed proof showing that there was a joint venture between plaintiffs and defendants"; (4) "in holding there was a sale or contract of sale, when the undisputed proof showed that Brown was not selling anything to plaintiffs, but was merely acting as their agent in transmitting their money to Kane for loan to Fields"; (5) "in holding that the receipts dated July 29, signed by Edmond L. Brown, Agent, one addressed to each of the plaintiffs, constituted securities, within the terms of the Texas Securities Act"; (6) "in holding that defendant Brown was a 'dealer,' within the terms of the Securities Act, the undisputed proof showing he was not, in the transactions with plaintiffs, dealing in securities under said Act"; (7) "in holding that the transactions involved in this case were not exempted transactions under sec. 3(c) and sec. 3(k) of the Securities Act"; (8) "in awarding judgment to plaintiffs under the Securities Act, because the Act does not undertake to regulate, and does not apply to, transactions between purchasers, but is rather intended to and does apply to transactions between sellers and purchasers, and to actions by purchasers against sellers"; (9) "in awarding judgment to plaintiffs under the Securities Act, because the Act does not undertake to regulate, and does not apply to, transactions between purchasers and their agent, but is rather intended to and does apply to transactions between sellers and purchasers, and to actions by purchasers against sellers";

(10) "in awarding judgment in favor of Cole (in addition to all points elsewhere herein applicable to both Cole and Gould), in that the undisputed proof showed that Cole was not sold anything by Brown and never even so much as talked to Brown about the transaction; that Gould brought Cole into the deal, and Brown merely transmitted his money." The law questions thus presented may be boiled down to this: Of whether, under the foregoing facts and circumstances, there was a sale to plaintiffs of any security by defendant Brown as the seller within purview of Art. 600a; with consequent right of action as a "purchaser," pursuant to section 33a thereof.

The Texas Securities Act, Art. 600a, originally passed in 1935, with later amendments, has replaced all previous Blue Sky Laws of Texas; the history and mutations of which are discussed by F. Lanier Cox, Professor, University of Texas College of Business Administration, in a helpful and up-to-date Commentary. See Vol. 2 V.A. C.S., p. XIII et seq., for such detailed analysis. Its basic requirements are (1) registration of securities to be sold, obtaining thereby a permit for their sale, and (2) the registration of dealers in securities and their salesmen; the 1935 legislation reciting "the need of more efficient and effective means of preventing fraud in the sale of securities." Acts 1935, c. 100, § 39. The Act in full is of considerable length and we will touch upon those sections only as may be deemed material to above related facts.

Section 2(a) defines the term "security" or "securities" as follows: "The term 'security' or 'securities' shall include any share, stock, treasury stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, preorganization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or

instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, *investment contract*, or any other instrument commonly known as a security, whether similar to those herein referred to or not." (Emphasis ours.) Sections 2(c) in part and 2(d) in full read: "The term 'dealer' shall include every person or company, other than a salesman, who engages in this State, either for all or part of his or its time, directly or through an agent, in selling, offering for sale or delivery or soliciting subscriptions to, or orders for, or undertaking to dispose of, or to invite offers for, or dealing in any other manner in any security or securities within this State. * * *." "(d) The term 'salesman' shall include every person or company employed or appointed or authorized by a dealer to sell, offer for sale or delivery, or solicit subscriptions to or orders for, or deal in any other manner, in securities within this State, whether by direct act or through subagents; provided, that the officers of a corporation or partners of a partnership shall not be deemed salesmen, where such corporation or partnership is registered as a dealer hereunder." Section 2(e): "The terms 'sale,' or 'offer for sale' or 'sell' shall include every disposition, or attempt to dispose of a security for value. The term 'sale' means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other thing of value, or any transfer or agreement to transfer, in trust or otherwise. Any security given or delivered with or as a bonus on account of, any purchase of securities or other thing of value, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value. The term 'sell' means any act by which a sale is made, and the term 'sale' or 'offer for sale' shall include a subscription, an option for sale, a solicitation of sale, an attempt to sell, or an offer to sell, directly or by an agent or salesman, by a circular, letter, or advertisement or otherwise, including the deposit in a United States Post Office or mail box or in any manner in the United States mails within this State of a letter, circular or other advertising matter; provided, however, that nothing herein shall limit or diminish the full meaning of the terms 'sale,' 'sell' or 'offer for sale' as used by or accepted in courts of law or equity. Provided, further, that the sale of a security under conditions which entitle the purchaser or subsequent holder to exchange the same for, or to purchase some other security shall not be deemed a sale or offer for sale of such other security; but no exchange for or sale of such other security shall ever be made unless and until the sale thereof shall have been first authorized in Texas under this Act, if not exempt hereunder, or by other provisions of law." Section 2(g): " 'Issuer' shall mean and include every company or person who proposes to issue, has issued, or shall hereafter issue any security." Section 3, subds. (a) through (r) relate to "Exempt transactions" not here relevant, except as raised in point 7 above.

Section 23 of the statute, Vernon's Annotated Civil, is headed: "Unlawful to sell securities without registration or temporary permit", and for brevity its pertinent subdivisions may be paraphrased. Basically, it declares unlawful the following activities: (1) Sale by a dealer of any securities unless the dealer shall be registered or the securities exempt under sec. 3 of the Act; (2) the issuance or publication by a dealer within the State of Texas of any "circular, advertisement, pamphlet, prospectus, program, or other matter in connection therewith, concerning any security or securities *which such dealer handles or proposes to sell*" (Emphasis ours) unless (a) the dealer shall be registered, (b) unless the dealer's name is stated thereon, and (c) unless the same shall first have been filed in Office of Secretary of State. Two series of exempt transactions are detailed in secs. 3 and 23, admittedly not applicable, other than appellant's claim of protection under secs. 3(c) and (k). Section 30, Art. 1083a, Vernon's Ann. P.C., makes a penal offense of the non-exempted operations referred to in secs. 3 and 23 absent registration or permit; and it should here be noted that the license al-

ready held by defendant Brown as salesman for Beer & Company had reference to the exempted subject matter of secs. 3 and 23, and not otherwise.

■ A further implied exemption has resulted from appellate constructions of the Act to the effect that it does not undertake to regulate purchasers or to protect sellers against purchasers of securities. Fowler v. Hults, 138 Tex. 636, 161 S.W.2d 478; Winslow v. Boyd, Tex.Civ.App., 195 S.W.2d 384; Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256; and Fowler v. Hults, supra, is authority for the conclusion that the Act does not apply to a broker or intermediary who is agent for the purchaser. See also 22 T.L.R. 350. The effectiveness of 33a as regards a voluntary compliance with the law is evidenced by the fact that no proceedings seeking its benefits have heretofore been undertaken; various decisions having given construction to 33b denying a recovery of commissions by agents without license or registration. See Note 49, p. XIX, Commentaries of Professor Cox. And that the Act is intended as a deterrent upon all dealers in securities, reputable as well as irresponsible, is clearly demonstrated in Smith v. Fishback, Tex. Civ.App., 123 S.W.2d 771, 778, writ ref., in the following statement of the court concerning its purpose: " * * * To our mind, it is a very complete statute, all terms are defined, and nothing is left to guesswork. * * * The operation of this statute may be burdensome, to some extent, on the honest securities dealer, but he must suffer this inconvenience in order that the body of the people may be protected from the person who would engage in this state in a ruthless, unrestrained sale of worthless securities. It could make no material difference, so far as the applicability of the statute is concerned, *that the stock in the proposed corporation was a safe investment.* Commercial Bldg. Co. v. Levy, 108 Cal.App. 54, 290 P. 1048." (Emphasis ours.)

The words "sale," "offer for sale" and "sell" in section 2(e) are given the broadest possible signification. Says Professor Cox: "Such words are intended to include every

disposition, or attempted to dispose, of a security for value. Offers, solicitations, and attempts to sell whether by circular, letter, advertisement, personal contact, or otherwise, in writing or orally are included. If a completed act of sale would come within the act, then any attempt to make such sale, however unsuccessful it may be, is included." See also Cosner v. Hancock, Tex.Civ.App., 149 S.W.2d 239. The term "dealer" is of equally broad comprehension; defined as every person who either for part or full time, directly or through an agent, engages "in selling, offering for sale or delivery or soliciting subscriptions to, or orders for, or undertaking to dispose of, or to invite offers for, or dealing in any other manner in any security or securities within this State." Subd. (c). See also the legislative definition of "security" or "securities" as hereinabove quoted.

■ Without question, the subject matter dealt with in exhibits 1, 3 and 6 must be denominated securities within terms of the Act. The sums advanced by plaintiffs were first described as "loans" at 5% to be repaid along with a bonus of $\frac{1}{8}$th interest in the capital stock of Industrial Ores, valued at $\frac{1}{10}$th of each $5,000 unit. There is no statement in the record from Kane-Fields expressive of a loan, nor evidence that 75% of the authorized common stock of Industrial Ores was ever placed in a Bank to secure the $30,000 loan as per representations of exhibit 1; in lieu of repayment of loan, the shares of Industrial Ores stock obviously reflecting the whole of their investment. The result was an investment contract, named as such in sec. 2(a) and defined in Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244, as "a contract or scheme (taking all of the instruments and elements of the scheme together) for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.' State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56, 177 N.W. 937, 938."

■ Our remaining concern presented by appellant in various points is of whether

there was a *sale* of securities within provisions of sec. 33a of which appellant was the dealer or seller. Appellant forcefully argues that under no circumstances had there been a sale by him to plaintiffs of anything; that they were all purchasers or joint venturers in the acquisition of these so-called securities; and therefore within the implied exemption of the cases above cited; in Lewis v. Davis, 145, Tex. 468, 199 S.W.2d 146, 149, (a suit to establish a partnership and accounting), the court holding in part that: "Neither petitioner nor respondent was required to register under the Securities Act as a condition precedent to acquiring oil and gas leases or other mineral interests"; and further, that if in Lewis' appeal, the aggrieved partner could not be denied the right to recover his interest in the partnership by failure of some of the partners to comply with the Act, then the converse is equally valid that in this case "dissatisfied joint venturers (Cole and Gould) may not recover of another joint venturer (Brown) because of the lack of registration of the persons or securities as required by the Securities Act." Appellant's case as stated undoubtedly has equitable overtones, he being "a fellow sufferer" and having "lost his money, too"; but the instant proceeding is one at law seeking a statutory remedy, invoking a law stringently regulatory of security transactions and with far-reaching penalties for its violation. "The fact that the penalties of a Blue Sky Law are drastic will not, standing alone, authorize the exception therefrom of transactions clearly within the spirit and letter of the law." 87 A.L.R., Annotations, p. 61; Guaranty Mortg. Co. v. Wilcox, 62 Utah 184, 218 P. 133, 30 A.L.R. 1324.

It is insisted that appellant was merely the agent of a named group of purchasers—the conduit through which their monies were channeled to Kane-Fields as per Brown's letter of July 29 and the undisputed facts. The record is replete with denials on part of Cole, Gould and Bloch that they had requested Brown to act as their agent; not realizing (they said) that he was holding himself out as such until

after their money was paid. The relationship of agency must have a consensual existence. 2 Tex.Jur., Agency, p. 384. So also the relation of joint adventurers is a matter of intent—a joint proprietary interest and control; 30 Am.Jur., pp. 681, 682, 683; Holcombe v. Lorino, 124 Tex. 446, 79 S.W.2d 307; see also Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Tex. 475, 191 S.W.2d 716; and such elements are not present in the case made by plaintiffs. While a statute, both remedial and penal, is to "be construed with at least a reasonable degree of strictness", Railroad Commission of Texas v. Texas & N. O. R. Co., Tex.Civ.App., 42 S.W.2d 1091, 1093, writ ref., we must hold that appellant's efforts toward success of the project, for instance his activities incident to the acquirement of a ¼th interest in Carbo Minera by the Dallas syndicate through the loan of $30,000 has extended his role as a mere purchaser to that of a seller, in event a dissatisfied fellow subscriber should choose to seek legal recoupment by resort to the provisions of sec. 33a. The term "sell," "sale" or "offer for sale" of sec. 2(e), as descriptive of a particular act and its noun "seller" as describing the actor, include among other things "a subscription, an option for sale, a solicitation of sale"; the word "dealer" having a like comprehensive meaning. The Kane-Fields proposal and its representations, prepared and furnished by appellant to others, served initially to arouse the interest of appellees, investigation by their agent Bloch, and later determination to invest. Appellant further, whether wittingly or not, made himself a virtual spokesman for Kane-Fields in his letters, Exhibits 3 and 6, transmitting funds that "This will also make it of record with Mr. Kane that your subscription is received for ⅛ of all authorized stock of Industrial Ores de Mexico * * *"; such extra participation in the project, without more, placing the activities of defendant literally within prohibition of the law.

It is contended that appellant received nothing from appellees except monies for transmittal to the Mexican corporation, is-

suer of the stock and the true offending party. Suffice it to say that the Act distinguishes between the issuer of securities and a "dealer" therein; the definition of "sell," "sale" or "offer for sale" and the various activities which the legislature has defined as the making of a sale not being dependent upon receipt by the dealer, salesman, or broker of the purchase funds. The Act comprehends all those who participate in the sale of a security. This principle has support in court decisions of other jurisdictions dealing with provisions alike with sec. 33a, or similar thereto. In Thompson v. Cain, 226 Mich. 609, 198 N.W. 249, 250, defendant Cain, having himself invested in the Louisiana corporations, drove the Company agents out to the farm of plaintiff, introducing them; and the sale was negotiated without further assistance of Cain, he honestly believing the proposition meritorious and acting in utmost good faith. Said the Michigan Court: "Hence if the defendant actively aided and assisted the agents Raymond and Thompson in making the sale he violated the Blue Sky Law, whether he profited by the sale or not." In Lewis v. Bricker, 235 Mich. 656, 209 N.W. 832, 835, an analogous fact situation, judgment was rendered against the intermediary Bricker, with the court statement: "In order to recover against the defendant, it was not necessary to show that he made representations as to the stock, or that what he did was the procuring cause of the sale. It is sufficient if it appears that he actively assisted in the unlawful common enterprise, which was the sale of the stock." See Cady v. Murphy, 2 Cir., 113 F.2d 988, and collected cases in 87 A.L.R., pp. 107–115, for like application of the rule in Federal and other American courts.

Section 33a requires the tender back of the security sold, which appellees observed by assignment of their rights in and to the contents of exhibits 3 and 6 (Brown's letter of July 29) together with refusal to accept the stock later offered to them; and the point is made that such letter-receipt, not owned by or in the name of the issuer, could not conceivably amount to a "security sold" or the tender thereof. Again, it is sufficient to say that these letters constituted the sole evidence of appellees' investment in Industrial Ores; the thing representative of securities sold; and thus in compliance with the Act. A similar contention was made in Muse v. State, 137 Tex.Cr.R. 622, 132 S.W.2d 596, 597, (an alleged inoperative mineral lease), with the court holding: "We do not think that it is necessary, in order to successfully predicate a criminal action on the unauthorized sale of a security, that such security should be a valid or perfect instrument."

This opinion has already extended to regrettable length and we will but briefly touch upon further points requiring discussion. (Point 7): Arguing that the subject securities were not exempt under either sec. 3(c) or sec. 3(k) of Art. 600a, the latter subdivision reading: "The sale of an interest in any partnership, pool, or other company, *not a corporation*, the total membership of which does not and will not after such sale exceed ten (10), and the organization expenses of which do not or will not exceed two (2%) per cent of the total invested capital of such company." (Emphasis ours.) Appellant cannot claim benefit of the quoted exemption, for under his letter of July 29, 1952 both Gould and Cole had subscribed to a purchase of a ⅛th interest in all authorized stock in a Mexican *corporation;* in the final analysis amounting to a stock investment of $5,000 each. (Point 10): That at least appellant was not liable to Cole with whom he never so much as talked about the transaction; Gould bringing Cole into the deal and Brown merely transmitting his money. The argument is well countered by such appellees in the following statement of counsel: "The fact that Brown originally solicited Gould does not relieve him of the solicitation, offer to sell and sale untimately made to Cole. Furthermore, the extensive negotiations with Bloch, who was admittedly acting as agent for both Cole and Gould, which fact was well known to Brown, would in itself be sufficient to sustain the judgment of the trial court in favor of Cole."

Above conclusions have been reached with considerable difficulty. The record

clearly reflects that defendant has here subjected himself to liability by an unintentional infringement upon legislation rather paternalistic in the comprehensiveness of its avowed purpose to protect purchasers against the sale of unregulated securities. It has been held constitutional. Smith v. Fishback, supra. And in closing we can but recur to the words of Judge Roberts in Duncan v. Magette, 25 Tex. 245, where the facts seem to have preponderated in favor of abstract justice as opposed to the applicable law, that "To follow the dictates of justice, when in harmony with the law, must be a pleasure; but to follow the rules of law, in their true spirit, to whatever consequences they may lead, is a duty. This applies as well to rules establishing remedies, as to those establishing rights."

All points of appeal are overruled and judgment of the trial court affirmed.