**DEVELOPMENT INVESTMENT CORPORATION, Appellant,**

v.

**DIVERSA, INC., Appellee.**

No. 7655.

Court of Civil Appeals of Texas.

Texarkana.

Aug. 24, 1965.

Rehearing Denied Sept. 14, 1965.

David M. Kendall, Jr., Woodruff, Hill, Bader & Kendall, Dallas, for appellant.

Marvin S. Sloman, Paul Carrington, Carrington, Johnson & Stephens, Dallas, for appellee.

DAVIS, Justice.

A summary judgment case. Plaintiff-appellant, Development Investment Corporation, hereinafter referred to as plaintiff, or DIC, sued defendant-appellee Diversa, Inc., hereinafter referred to as defendant, or Diversa, for the value of services rendered by plaintiff to defendant pursuant to an oral contract; or, for compensation, or a so-called "Finders Fee" allegedly due plaintiff in connection with the purchase by defendant of the stocks in three insurance companies from the Blakley-Braniff Foundation.

According to the pleadings, during the latter part of the year of 1961, Blakley-Braniff Foundation, hereinafter referred to as the Foundation, the owner of all the capital stocks of Girard Life Insurance Company, Girardian Insurance Company, and Guardian Underwriters Insurance Company, and their assets, advised Edwin T. Slaughter, Superintendent of DIC, that it was interested in disposing of the stocks. Slaughter secured from the Foundation and from the three insurance companies information concerning the stocks and assets of said insurance companies, their financial status, and other similar facts which would be of interest to a prospective purchaser. Slaughter then contacted Ernest D. Wright, Vice President of Diversa, along with many other prospective purchasers, advising them of the availability of the stocks for sale. Gerald C. Mann was Chairman of the Board and President of Diversa until November, 1962, and then was Chairman of the Board and Chief Executive Officer. The information acquired by plaintiff was submitted to defendant. This included an appraisal of the real estate which valued the assets at approximately $60,000,000.00. They were trying to sell the three insurance companies' stocks and assets to defendant for about 25 million dollars to 27 million

dollars. Defendant, through Wright, advised the plaintiff on or about March 15, 1962, that they were not interested in the purchase.

A group of the plaintiffs immediately formed a new corporation known as Consolidated Exchange Corporation. Immediately after March 15, 1962, plaintiffs commenced to try to borrow $4,500,000.00 from defendant. Later, on April 29, 1962, they wrote a letter to Wright in which they sought a $6,500,000.00 loan. The loan was refused.

In March of 1963, Senator William A. Blakley contacted Gerald C. Mann for the purpose of selling him the stocks in the three insurance companies. Blakley made Mann an offer in which Mann, personally, was interested. Mann secured certain help to make an investigation of the overall condition of the three insurance companies. The information secured in 1963, and the price offered were so interesting that Gerald C. Mann, personally, signed a "Stock Purchase Agreement" on April 10, 1963, and put up a forfeit of $100,000.00. The Stock Purchase Agreement further provided that if the contract was not closed within 120 days that Gerald C. Mann would put up another $150,000.00, which he did. Although Gerald C. Mann signed the Stock Purchase Agreement, the Diversa, Inc. later made the purchase in July of 1963.

Plaintiff became a dormant corporation in November or December of 1962. Plaintiff filed this suit in the name of the corporation and took the deposition of Edward T. Slaughter. He testified that he was the President during the years 1961 and 1962, and submitted the stocks and assets for sale to defendant on a "look-see" basis; that defendant was not interested in the purchase, and returned all the information to plaintiff on or about March 15, 1962; that he, Edward T. Slaughter, did not have any interest in any remuneration from the deal, and did not feel like plaintiff did either. Edward T. Slaughter was the man that did most of the contacts with the defendant.

Defendant filed a second motion for summary judgment in which it alleged, in part, as follows:

"1. Neither defendant nor anyone acting for defendant entered into any agreement, contract, or understanding, such as is alleged in plaintiff's petition or otherwise, whereby there was imposed on defendant any duty owed to plaintiff which has been breached by defendant.

"2. (a) No officer, agent or employee of defendant had, or exercised, or displayed, any actual or apparent authority to make any contract, agreement or understanding of any character whatsoever with plaintiff on behalf of defendant. Neither defendant nor any officer, agent or employee of defendant did anything which would induce plaintiff or any representative of plaintiff to believe that any such officer, agent or employee possessed such authority or appeared to possess such authority.

"(b) Moreover, plaintiff's representatives dealt with a vice-president of defendant, and such representatives of plaintiff actually knew that defendant's vice-president had no authority to commit defendant to or assume or undertake for defendant, any obligation to plaintiff of any character whatsoever.

"3. A representative of plaintiff first presented the stock___of the three insurance companies referred to in plaintiff's petitions, to a vice-president of defendant, stating and representing to him that defendant could examine into the companies and their assets without obligation, and upon the express representation, condition and understanding that if (and only if) defendant were preliminarily interested in pursuing further the possibility of acquisition of the stock___of the three insurance companies would plaintiff expect defendant to negotiate with plaintiff as to compensation to be paid plaintiff in connection with any acquisition of the stocks by defendant should defendant thereafter undertake to negotiate for the purchase of the stock___.

"Such a condition and express understanding was ever fulfilled. Defendant neither had nor ever developed any interest in the deal presented for the stocks and so advised plaintiff, ending whatever the duty or responsibility there then was to plaintiff, if any.

"4. Plaintiff itself thereafter completely abandoned any proposal whereby it hoped to induce or interest defendant in considering a purchase of the insurance companies' stocks, on any terms. Plaintiff did make one other approach to defendant, trying to get defendant to lend plaintiff or a corporation formed by plaintiff several million dollars so plaintiff or such corporation could buy the insurance companies' stocks. Defendant had no interest in lending any sum of money to plaintiff, and refused such proposition. Defendant does not owe plaintiff anything for listening to plaintiff's representatives try to induce defendant to lend a large sum of money to plaintiff or for plaintiff's benefit.

"5. Months after all the foregoing, and having long abandoned any and all contact with defendant or defendant's representatives with regard to the insurance companies' stocks, plaintiff abandoned any interest in the stocks of the three insurance companies. Plaintiff became an inactive and dormant corporation, and long before defendant ever began to have any interest in acquiring the stock___of the three insurance companies plaintiff had gone out of business, and its officers, directors and shareholders had taken up other and outside endeavors and were no longer attempting to interest defendant, or any of the others they had meanwhile tried to interest, in the

stocks of the three insurance companies.

"6. Later, the chief executive officer of defendant did become interested in making an investigation into the stocks of the three insurance companies, and the assets and properties of such companies, with a possibility in mind of acquiring such stocks; and finally he made a personal commitment for the acquisition of the stocks, intending same for the benefit of defendant should it finally appear that defendant in the judgment of its board of directors desired to acquire them. Ultimately defendant did so elect and did acquire the stocks.

"The interest of the chief executive officer of defendant in making an investigation and in securing the right (later exercised by and for the benefit of defendant) to acquire the insurance companies' stocks, arose wholly through the efforts of an individual who was in no way connected with plaintiff. The discussions with such individual, the investigation of the stocks and the insurance companies and their assets, and the contracting for the right to acquire the stocks, and their acquisition were wholly unconnected with plaintiff in any way.

"7. Moreover, the acquisition of the stocks by defendant was entirely a different deal from anything ever suggested or presented by plaintiff. Furthermore, major differences in the deal resulted from transactions which took place after plaintiff had ceased to do business and its personnel had dispersed, and were transactions which plaintiff did not and could not have had anything to do with.

"8. At all times material to this action neither plaintiff nor any of its officers was. a licensed securities dealer under the Texas Securities Act then in effect, Art. 581 of the Revised Civil Statutes of Texas (Senate Bill 294, chapter 269, Acts of the 55th Leg.) and under the specific provisions of section 34 of said Act plaintiff is not entitled to bring or maintain this action."

The trial court granted the second motion for summary judgment. Plaintiff perfected its appeal. It brings forward 9 points of error. The defendants challenged the appeal and bring forward 5 counterpoints of error.

By its points 7, 8 and 9, plaintiff says that it is not required to have a Securities Dealer's License as required by Art. 581–34, Vernon's R.C.S., (Texas Securities Act), because defendant was actually engaged in buying and selling securities and the Securities Act is not designed to protect purchasers situated as was defendant. It relies on Art. 581-5(H), R.C.S.

Defendant, by its counter-point 5, takes the position that the trial court correctly rendered final summary judgment on the ground that plaintiff is not entitled to bring or maintain this suit because at no time did it have a Securities Dealer's License under the Texas Securities Act, Art. 581–34, R.C. S., and no exemption from the provision of the Act is available to the plaintiff, and there was no showing of any genuine issue of material fact on this question.

We do not construe the statute to mean that the plaintiff is exempt under the transaction involved. Art. 581–5(H), R.C.S., "Exempt Transactions", reads as follows:

"Except as hereinafter in this Act specifically provided, the provisions of this Act shall not apply to the sale of any security when made in any of the following transactions and under any of the following conditions, and the company or person engaged therein shall not be deemed a dealer within the meaning of this Act; that is to say, the provisions of this Act shall not apply to any sale, offer for sale, solicitation, subscription, dealing in or delivery

of any security under any of the following transactions or conditions:

"* * *

"H. The sale of any security to any bank, trust company, building and loan association, insurance company, surety or guaranty company, savings institution, investment company as defined in the Investment Company Act of 1940, small business investment company as defined in the Small Business Investment Act of 1958, as amended, or to any registered dealer actually engaged in buying and selling securities; or the issue or sale of any investment contract in connection with an employees' stock bonus, annuity, pension, profit-sharing or similar employee benefit plan provided the securities purchased under the plan either would be exempt if sold by a registered dealer under Section 6 hereof or shall be qualified under Section 7 hereof or purchased in a transaction exempt under Section 5 hereof."

There is no pleading or proof that the defendant was engaged in buying and selling securities as the main course of their business. Lawyers Lloyds of Texas v. Webb (Tex.Civ.App.) 150 S.W.2d 181, reversed on other grounds 137 Tex. 107, 152 S.W.2d 1096; Head v. New York Life Ins. Co. (Tenth Cir.Ct. of App.) 43 F.2d 517; York v. Dotson (Tex.Civ.App.) 271 S.W.2d 347, E.R., N.R.E.

Plaintiff relies on the above quoted statute, as well as the following cases in which the character of the defendant as a "purchaser" was involved: Fowler v. Hultz, 138 Tex. 636, 161 S.W.2d 478; Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146; Hull v. Fitz-Gerald (Tex.Civ.App.) 232 S.W.2d 93, affirmed with dissenting opinion, Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256; and, Dunnam v. Dillingham (Tex.Civ.App.) 345 S.W.2d 314, N.W.H. These suits are by oil and gas landmen seeking to recover against lessees and having purchased leases when hired to do so by the lessees themselves. The Supreme Court approval of the Civil Appeals' decision in Shriver v. Stoddard (Tex.Civ.App.) 188 S.W.2d 892, er. ref., and in Manering v. North Texas Producers Association (Tex.Civ.App.) 370 S.W.2d 939, E.R., N.R.E., indicate that the oil and gas landmen's cases are so limited. At the time the Foundation told the plaintiff that it was interested in selling the stock and assets in the three insurance companies, the Foundation told the plaintiffs that they would not pay any fee or commission in the event they found a purchaser. The plaintiff was the agent, in fact, of the Foundation. It was alleged and shown by the pleading and the depositions on file (there are 10 depositions containing about one thousand pages and numerous exhibits on file), that in the event the defendant was interested in purchasing the stocks and assets they would get together and make a reasonable agreement as to a commission, or a position for the plaintiffs; this meant that if the defendants were interested in purchasing the stocks and assets that the defendant would agree on a cash commission; or, for the plaintiffs to receive some stocks. The only thing that is shown by the pleading and the depositions is that this discussion was had with Wright, a Vice President of Diversa, who had no authority to bind the defendants. There being no agreement to purchase the stocks there was no agreement to pay a commission, or for a position.

█ The plaintiffs are bound by Art. 581–34, R.C.S., "Actions for Commission; Allegations and Proof of Compliance", which reads as follows:

"No person or company shall bring or maintain any action in the courts of this state for collection of a commission or compensation for services rendered in the sale or purchase of securities, as that term is herein defined, without alleging and proving that such person or company was duly licensed under the provisions hereof and the securities so sold were duly

registered under the provisions hereof at the time the alleged cause of action arose; provided, however, that this section or provision of this Act shall not apply to the exempt transactions set forth in Section 5 of this Act nor to the sale and purchase of exempt securities listed in Section 6 of this Act, when sold by a registered dealer."

It will be noted that the defendant alleged in its second motion for summary judgment that "At all times material to this action neither plaintiff nor any of its officers was a licensed security dealer under the Texas Security Act * * *". It was upheld in Manering v. North Texas Producers Association, supra, " * * * that the plaintiff must allege and prove his license when seeking a recovery of compensation based upon a transaction which contemplates the sale and transfer of real estate or securities. * * *" Such is the holding in Shriver v. Stoddard, supra, and Sibley v. Coffield (Tex.Civ.App.) 193 S.W.2d 239, E.R., N.R.E. Plaintiff's points 7, 8, and 9 are overruled and defendant's counter-point 5 is sustained.

Plaintiff contends by its points 1 through 6 inclusive, that there were material issues of fact as to the agreement to pay a commission, or create a position, between plaintiff and defendant; that defendant had breached the agreement; that defendant profited from the agreement; that plaintiff was entitled to compensation from defendant for the use of the information and services provided to it by plaintiff; that Wright, Vice President of defendant, had authority to agree with plaintiff to pay plaintiff a reasonable fee; and, that Wright had apparent authority from defendant to agree with plaintiff to pay plaintiff a reasonable fee if defendant made use of the information and services provided to it by plaintiff.

Plaintiff was seeking to recover a commission, or a so-called "finder's fee", from the defendant for the purchase of the stocks of three insurance companies, based upon an alleged agreement between the plaintiff and an officer of the defendant who did not have any authority at all to make any such alleged agreement. In view of the pleadings, the second motion for summary judgment which was accompanied by two affidavits, and the ten depositions on file, it does not seem that any such agreement was made in the past, or the issue could be raised in the future. Whether there could be a material issue of fact raised or not, the plaintiffs could not recover because of the fact that they are not licensed under the Securities Act. Gerald C. Mann testified positively and without any contradiction in the record, that he did not make any use of the information or advice furnished to him, personally, or to the defendant, from plaintiff, or Slaughter, in connection with his decision at the time he decided to sign the purchase agreement contract on April 10, 1963, more than a year after they had refused the previous purchase. Gerald C. Mann further testified that he acquired the stocks and assets in the three insurance companies for a total consideration of about Thirteen Million Nine Hundred Sixty Thousand ($13,960,-000.00) Dollars, which was almost 50% less than the sale price as offered to defendant by the plaintiff. There does not exist any material issue fact. Air Conditioning Inc. v. Harrison-Wilson-Pearson, 151 Tex. 635, 253 S.W.2d 422; Watson v. Upfield (Tex. Civ.App.) 335 S.W.2d 777, N.W.H.; Rule 166–A, Vernon's Ann.Tex.Rules of Civil Procedure, and authorities cited there. Plaintiff's points 1 through 6 are overruled.

The judgment of the trial court is affirmed.

FANNING, J., concurs.

CHADICK, Chief Justice (disqualified).

My disqualification to participate in this case was made known to the parties shortly after the case was transferred to this court. I took no part in its determination.