EDMOND L. BROWN v. HAROLD G. COLE ET AL

No. A-5244. Decided March 28, 1956.
Rehearing overruled June 20, 1956.
(291 S.W. 2d Series 704)

*Golden, Croley, Howell, Johnson & Mizell, J. Ralph Howell, Jr.* and *John L. Roach,* of Dallas, for petitioner.

The Court of Civil Appeals erred in holding that there was a sale, or contract of sale within the terms of the securities act, since the evidence showed that the respondent did not purchase anything from petitioners, but were merely copurchasers with petitioner, all having made a purchase from a third party or all having made a loan to a third party and the securities act does not undertake to regulate nor does it apply to transactions between copurchasers or joint venturers. Fowler v. Hults, 138 Texas 636, 161 S.W. 2d 478; Lewis v. Davis, 145 Texas 468, 199 S.W. 2d 146; Smith v. Fishback, 123 S.W. 2d 771 error refused.

*Douglas E. Bergman, Davidson & Silverberg,* and *Philip Silverberg,* all of Dallas, for respondent.

In response to petitioners points cited Herren v. Hollings-

worth, 140 Texas 263, 167 S.W. 2d 735; Luling Oil & Gas Co. v. Humble Oil & Refining Co., 191 S.W. 2d 716; Holcombe v. Lorino, 124 Texas 446, 79 S.W. 2d 307.

MR. JUSTICE CULVER delivered the opinion of the Court.

Respondents Cole and Gould sued to recover from Brown the sum of $10,000.00 expended in an alleged purchase of securities sold to them by petitioner, Brown, in violation of Article 600a, Vernon's Civil Statutes, and commonly known as the Texas Securities Act. Judgment in favor of respondents has been affirmed by the Court of Civil Appeals. 276 S.W. 2d 369. We agree with that result.

The facts are set forth in great detail in that opinion and we shall only summarize them as briefly as possible.

A mining operator in Mexico, Howard Fields, required funds for further development of his properties. His authorized representative, Kane, proposed that Brown and others lend $30,-000.00 to Fields for that purpose. The loan would be paid within a reasonable time with interest at five per cent. It was further proposed that Fields would convey his mining properties to a corporation, Carbo Minera S.A., and one-fourth of the capital stock of Carbo Minera would be transferred to another corporation, Industrial Ores de Mexico. The stock in the latter corporation would then be issued to the lenders of the $30,000.00 proportionately as a further consideration. Brown was at the time a salesman for Beer & Company, a dealer in securities, and a partner in the firm of Brown & Ivey. Brown and Ivey participated in the loan in the amount of $5,000.00, Gould and Cole for $5,000.00 each and others, not parties to this litigation, came in for varying amounts.

Brown presented the venture to Gould, and furnished him with a copy of a memorandum and prospectus that included a description of the properties owned by Fields, a financial statement and other information.[1] Gould in turn then made known the proposal to Cole. The matter was discussed between Gould and Brown on several occasions, and upon request Gould mailed to Cole a copy of the memorandum and prospectus. Gould and Cole not being satisfied entirely as to the merits of the venture, Brown proposed that he and Cole's auditor, Bloch, would go

---

[1]This memorandum is shown in full as a Note to the Court of Civil Appeals opinion, 276 S.W. 2d 371.

to Mexico and make a first-hand investigation. Brown defrayed the expenses of this trip for both himself and Bloch, without any agreement or understanding that the respondents, or anyone else, would reimburse him for any part of this expense.

Upon their return, Bloch's report being satisfactory, both Cole and Gould decided to participate to the extent of $5,000.00 each, and Bloch himself invested $1250.00.

In accordance with instructions from Brown, Gould and Cole made their checks payable to E. L. Brown, Agent. Brown acknowledged receipt of the checks, writing each respondent as follows:

"This letter will acknowledge receipt of your check for $5,000.00 which will be deposited to the E. L. Brown, agent account at the Republic National Bank, Dallas, for transmittal to William G. Kane and will in turn be transmitted to Howard H. Fields. It is understood that the loan will be repaid by Fields through Kane as promptly as is advisable. This will also make it of record with Mr. Kane that your subscription is received for 1/8th of all authorized stock of Industrial Ores de Mexico, S.A. De C.V., and that the total stock of the company now consists of 27,000 shares of preferred and 30,000 common—all one peso par. The total subscription cost to you will be $500.00 payable on or before July 1, 1953. It is mutually understood that this is for private investment purposes and that I am acting as agent for the group."

Brown promptly transferred these funds to Kane, in Mexico.

Some months later the parties hereto ascertained that the affairs of these two Mexico corporations had been misrepresented to them by Fields and Kane, and it became more or less apparent that the investment would be a total loss. Later, the certificates of stock in Industrial Ores de Mexico were tendered to respondents, and by them rejected. Thereafter respondents assigned and delivered to Brown all of their right, title and interest "in and to all of the property, property rights and increment described in the attached instrument (letters of receipt from Brown, otherwise described as Exhibits 3 and 6) intending by this general description to include all of my right, title and interest in and to the $5,000.00 loan and the stock subscription rights described in Exhibit A," thus seeking to comply with Section 33a of Article 600a, Vernon's Texas Civil Statutes.

It is admitted that Brown was not registered as a dealer under the Texas Securities Act, and that the Secretary of State had issued no permit authorizing the issuance and disposal of the alleged securities. Therefore the question here presented for determination is whether or not petitioner Brown made a sale of "securities" to the respondents.

So far as we are aware, this is the first time a case invoking the penalties of Section 33a has reached the appellate courts, though in Smith et al v. Fishback et al., 123 S.W. 2d 771, writ refused, decided prior to the adoption of Section 33a, an exchange of stock in a corporation for oil royalties was held to constitute a sale of securities within the purview of the Securities Act requiring a permit from the Secretary of State, and the plaintiffs were allowed to cancel and rescind their contract.

Petitioner asserts that the Securities Act does not apply to this transaction, for the following reasons: (1) That he made no sale of any securities to respondents, but was merely a co-purchaser or joint adventurer with them; (2) that he was an agent only of respondents and other investors in transmitting their money to Kane for delivery to Fields; (3) that in the transaction he was not dealing with securities within the terms of the Act; and (4) that the transaction was exempt under Section 3 (k) of the Securities Act.

As to the first point, petitioner argues that Kane was the seller, and Gould and Cole merely joined with petitioner and others in making the loan to Carbo Minera or Fields and the acquisition of stock in Industrial Ores de Mexico. The facts do show that Brown invested his funds along with respondents', and, like them, sustained a total loss; that he received no profit or commission on the transaction; that he knowingly did not make any false representations of fact; and that respondents did not rely on any statements made to them by petitioner, but, on the contrary, conducted their own investigation, through their own auditor, and relied solely on the auditor's report. Petitioner maintains that all subscribing parties to this loan were acting together as co-purchasers; that Brown merely served as the agent of respondents in transmitting their money to Kane, and that petitioner and respondents acquired equal rights from the same person and made the same investment in the same manner.

■ Admittedly, the Act does not undertake to regulate pur-

chasers or to protect sellers against purchasers. Only sellers and sales are regulated. Fowler v. Hults, 138 Texas 636, 161 S.W. 2d 478; Lewis v. Davis, 145 Texas 468, 199 S.W. 2d 146.

■ The fact that Brown also became a purchaser and a participant does not ipso facto prevent his being a seller. Obviously a dealer could purchase a part of the securities he offered for sale and sell a part to others. The provisions of the Securities Act are broad and comprehensive. Section 2(e) defines the term "sale," or "offer for sale" or "sell" as including "every disposition, or attempt to dispose of a security for value," and provides that "any security given or delivered with or as a bonus on account of, any purchase of securities or other thing of value, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value." The Act further defines the term "sell" as meaning "any act by which a sale is made, and the term 'sale' or 'offer for sale' shall include a subscription, an option for sale, a solicitation of sale, an attempt to sell, or an offer to sell, directly or by an agent or salesman."

Under the terms of the Act it is true that Kane was a seller, but if that fact alone would relieve petitioner of his responsibility then Kane could have denied acting in the capacity of a seller by showing that Fields was the seller. Clearly there may be more than one. As we interpret the Act the seller may be any link in the chain of the selling process or in the words of the Act he is one who performs "any act by which a sale is made." Suppose that Kane had agreed to pay Brown a commission on securing the participation of respondents and others in this venture, then it could hardly be denied that under the facts here shown Brown would have earned that commission because his efforts resulted in the participation by respondents.

Petitioner claims that he was acting only as the agent or intermediary of respondents in accepting the funds and forwarding them to the seller, solely for convenience and orderly handling. He says this is completely shown by all the facts and circumstances, and particularly by the letters of acknowledgment (Exhibits 3 and 6) written to respondents with the notation that he was acting for the group. In support of his position petitioner cites Herren v. Hollingsworth, 140 Texas 263, 167 S.W. 2d 735, where the Securities Act was held not to apply. In that case, however, Herren was neither to sell nor to buy. He was authorized to find a driller who would explore Hollingsworth's ranch for oil and gas, and a contract, if agreeable to

the driller and Hollingsworth, would then be negotiated between them. This cause of action, like that in Fowler v. Hults, supra, was not condemned by the Securities Act. Granting that Brown was the agent of respondents, as he must have been in the transmittal of the funds to Kane, that was only a part of and resulted from dealings had theretofore with respondents. The respondents had agreed to participate in the deal prior to the time the letters of acknowledgment were written. Petitioner could not, by designating himself as agent, escape his responsibility for the negotiations with Gould and Cole leading up to their purchase. Brown himself admitted that originally the matter was submitted to him by Kane, and that it was from his presentation of the proposal to respondents that they became interested. He testified, referring to Gould and Cole:

"Q. And the entire conversations with reference to the matter were with you, were they not, with one exception of the trip to Mexico which Mr. Bloch made with you; is that correct?

"A. Yes, I should say so."

In Michigan it is sufficient to hold one liable to the purchaser if he actively assists in the unlawful sale of the stock, by way of introducing salesmen and recommending the securities, notwithstanding the fact that he made no representations and was not the procuring cause of the sale. And this is also true though he had invested his own money, believing he would make a profit, and had received no commission on the sale. Lewis v. Bicker, 235 Mich. 656, 209 N.W. 832; Chambers v. Beckwith, 247 Mich. 255, 225 N.W. 605; Thompson v. Cain, 226 Mich. 609, 198 N.W. 249.

But Brown displayed considerably more salesmanship activity than was shown in the Michigan cases. After he initially discussed the proposal with Gould a conference was held in Brown's office with Cole, Gould and Bloch present and Brown wrote for further information. A few days later Brown called Bloch and showed him etters received in response to that inquiry. Brown then wr  for further details and again talked to Bloch showing him t  additional information received. The trip to Mexico was then  e at Brown's suggestion and at his expense. When the resp  nts agreed to make the investment Brown gave instructions  to how the checks were to be made and the money remitted.  is clear that but for Brown's activi-

ties and repeated efforts the respondents would not have participated in the transaction.

■ It is well settled that the Act does not apply to a joint adventurer and to transactions between joint adventurers. Joint adventurers and partners are not to be denied the right to recover their interest merely because of a failure to comply with the Securities Act and we think it equally true that a dissatisfied joint adventurer may not recover from other joint adventurers merely because of the failure of the latter to comply with the Act. Polk v. Chandler, 276 Mich. 527, 268 N.W. 732.

To constitute a joint adventure there must be a community of interest and participation in the profits. It is in the nature of a partnership engaged in the joint prosecution of a particular transaction for mutual profit. Holcombe v. Lorino, 124 Texas 446, 79 S.W. 2d 307.

For a joint adventure to exist there must be a community of interest both as to the profits and losses, if any. It is said in Luling Oil & Gas Co. v. Humble Oil and Refining Co., 144 Texas 475, 191 S.W. 2d 716, that whether or not such relationship exists generally depends upon the intention of the parties. In that case the relationship was held not to be a joint adventure or partnership. The contract did not authorize either party to create any liability to third parties which would have been binding on the other.. The relationship being in the nature of a partnership, losses must be shared as well as profits.

In our case, if there was a community interest it could be said to exist only in that the petitioner as well as the respondents alike invested their funds. Each was to be repaid the amount of his loan. But, in addition thereto, and as a consideration for making the loan, each was to receive his pro rata amount of the stock in Industrial Ores de Mexico. Each was at liberty to sell, dispose of, or hold that stock, as he saw fit.

An illustration of a joint adventure is given in Worth Finance Co. v. Hillard Motor Co., Tex. Civ. App. 1939, 131 S.W. 2d 416. The two defendants purchased an automobile for the purpose of selling it for a joint profit to both of them. They both expressly warranted the title, and divided the profits.

In our case it would have been possible, through the sale of the stock in Industrial Ores de Mexico, for the several investors to realize a profit in varying amounts, depending upon

the time of sale of the stock. There was no joint control of the enterprise. Neither petitioner nor respondents were officers or directors of Industrial Ores de Mexico or exercised any authority over its operations. It was entirely under the management of Fields and Kane. We conclude, therefore, that the elements of joint adventure are not present in this case.

In support of his contention that the transaction constituted a joint adventure petitioner cites two cases from the Supreme Court of Michigan, Hathaway v. Porter Royalty Co., 296 Mich. 90, 295 N.W. 571, 138 A.L.R. 955, and Polk v. Chandler, 276 Mich. 527, 268 N.W. 732. In the latter case fourteen men desired to and actually did purchase 240 acres of land presumably to hold or develop at a profit. Because the owner would sell only to those financially responsible, the land was taken in the name of two of the parties and certificates of participation issued to all describing the interest owned by each. The court held this to be a joint adventure and the provisions of the Blue Sky Law were not applicable. In the former case a joint adventure is defined as an enterprise jointly undertaken to carry out a single project for profit with profits shared as well as the losses. In addition it was said that there must be a community interest as well as some control over the subject matter or property rights of the contract. We think neither of these cases aid petitioner in his claim of joint adventure.

Petitioner maintains that the Court of Civil Appeals erred in holding that Exhibits 1, 3 and 6 must be denominated securities within the terms of the Act. Exhibit 1 is the memorandum furnished by petitioner to the respondents, and quoted as a footnote in the Court of Civil Appeals opinion. Exhibits 3 and 6 are the letters written by petitioner to respondents acknowledging receipt of the money for transmittal to Kane. These were the papers returned by respondents when they demanded reimbursement from Brown. The petitioner insists that under no theory could these documents be termed securities, for the reason that one was simply a prospectus or a statement of the plan, and the others were merely receipts, upon which no suit could be brought and were binding on no one; that Brown could not and did not sell to the respondents the prospectus or the receipts. We think that position is untenable.

These were the only instruments issued to the respondents and clearly recited the nature of the tranaction. They must be construed as "evidence of indebtedness." The term "security" is broadly defined in the Act, in part, as any preorganization

certificate or receipt or note or other evidence of indebtedness. Art. 600a, Sec. 2(a). The definition sufficiently covers and includes receipts of the character here given. Under the Federal Securities Act of 1933 the giving of a promissory note or an evidence of an indebtedness in exchange for the personal loan is held to be a sale of securities in purview of the Act. Llanos v. United States, 206 F. 2d 852.[2] At any rate the stock in Industrial Ores de Mexico to be issued to respondents as a part of the consideration for the loan was a "security." That stock was not delivered to the respondents at the time they gave their checks to Brown because it had not been issued by the corporation. Later the certificates of stock were tendered to the respondents and rejected. The actual consideration for the money paid by the respondents was the promise to repay and to assign to each one-eighth of the total capital stock in Industrial Ores de Mexico.

Petitioner argues, however, that the recited consideration for this stock was an additional payment of $500.00 and that the $500.00 was never paid. The facts are that Brown suggested that the sum of $500.00 be agreed upon as an arbitrary figure set for tax purposes only. The $500.00 was not to be paid by the parties for the stock but was to be retained by the Industrial Ores de Mexico out of funds received from Carbo Minera. The only and total consideration on the part of Gould & Cole was the $5000.00 each remitted to Brown.

We conclude that the transaction did constitute a sale from Brown to respondents and that respondents sufficiently complied with the provisions of Sec. 33a of the Act by reconveying to Brown all of the interest purchased by them and all evidence of indebtedness.

■ Petitioner argues that if he is to be stamped as a seller then likewise Gould made a sale to Cole and Cole in turn made a sale to Bloch and that all this would lead to "a complete standoff and interminable and inconclusive litigation" the result being that they were all one at the same time, sellers as well as purchasers. This argument is unsound first because a violation of the law by one person would not excuse another's violation. If Gould had sold to Cole it would not relieve Brown on his sale to Gould. In the second place we think, so far as the sales made to Gould and Cole were concerned, Brown was the

---

[2]Compare Federal Securities Act, 15 U.S.C.A., 77b, (1) (3) with the Securities Act, Art. 600a, Vernon's Ann. Civ. Stats., Sec. 2, (a) (e).

principal actor. While he had little, conversation with Cole he did deal directly with Bloch, who was Cole's auditor and agent.

The last Point is that the Act did not apply to the transaction described because it came under an exemption in Subdivision (k), reading:

"The sale of an interest in any partnership, pool, or other company, not a corporation, the total membership of which does not and will not after such sale exceed ten (10) and the organization expenses of which do not or will not exceed two (2%) per cent of the total invested capital of such company."

There seems to be some dispute as to whether or not the total membership exceeded the stated number of ten, and we do not find any testimony as to whether or not the organization expenses exceed two per cent of the total invested capital of the company. It would seem to be the burden resting upon petitioner to prove the facts which would exclude him from the operation of the Act. But, at any rate, it appears that the interest sold in this case was in a corporation,—namely, Industrial Ores de Mexico, and therefore the exemption does not apply.

True enough to hold Brown liable to respondents is a harsh penalty and a rather inequitable result. The respondents were not misled by Brown who made no profit or commission and likewise sustained a total loss of his investment. The respondents knew that it was a speculation and presumably at the time considered that they stood to lose. Naturally if the venture had turned out to be in their favor no doubt they would gladly have accepted the profit. On the other hand, the case is not one dealing with equitable pi  ᵗˢles, but with the application of the Securities Act that was᾿ based to prevent the very thing that happened here, namely,  ᵗⁱle of worthless stock. Despite our natural sympathy for tɪ   itioner under these circumstances we must sustain respond:   cause of action which may be summarized as follows:

1. Petitioner was an     icensed "dealer" in securities.

2. Petitioner made a     le" of a security to respondents.

3. Petitioner failed to secure a permit for the sale of the security.

4. Petitioner is liable to respondents for the full purchase price of the security, plus interest.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered March 28, 1956.

MR. JUSTICE SMITH dissenting.

I respectfully dissent. It is my opinion that if the petitioner, Brown, had presented the matters involved here to the Securities Division of the office of the Secretary of State for a determination, he would have been advised that the transaction was exempt under Article 600a, Vernon's Annotated Civil Statutes. It seems to me that this conclusion is inescapable in view of the evidence that respondents, Gould and Cole, placed no reliance whatever on any representation of Brown, but to the contrary agreed to make the loan after a careful independent investigation. The respondents concede that Brown perpetrated no fraud or acted in bad faith in any manner. The respondents parted with no money on the strength of Brown's representation, but they relied solely on their own judgment. The transaction involved, even though it is held that Exhibits 3 and 6 are securities within the meaning of the Act, are exempt under Section 3 of the Act and petitioner cannot be held liable under Section 33a thereof. The transaction involved here does not authorize the Secretary of State to proceed against Brown under Section 33 of the Act. This section provides that "Whenever it shall appear to the Secretary of State either upon complaint or otherwise, that in the issuance, sale, promotion, negotiation, advertisement or distribution of any securities within this State, including any security embraced in the subsections of Section 23, and including any transaction exempted under the provisions of Section 3, any person or company shall have employed or employs, or is about to employ any device, scheme or artifice to defraud, etc. * * *." The reason why such action cannot be taken is the fact that it is conceded that Brown performed no fraudulent act in connection with the loan. Just here I wish to say that the transaction here was the lending of money whether it was loaned at 6% interest or whether stock of greater value was to be received in return. It is my contention, granting for the sake of argument that Exhibits 3 and 6 are securities, that it is a security contemplated under Section 3, an exempt transaction rather than a security under Section 23 of the Act. One reason it comes under Section 3 is the fact that all the evidence shows a joint venture.

The majority concedes that the Texas Securities Act does not apply to a joint adventure and to transactions between joint adventurers, and that a dissatisfied joint adventurer may not recover from other joint adventurers merely because of failure of the latter to comply with the Act. I cannot agree with the conclusion of the majority that the record in this case does not support petitioner's contention that he and respondents were co-purchasers or co-investors or co-adventurers or joint adventurers in the same enterprise, and that all the acts of petitioner and more especially the writing of the letters, designated in the record as Exhibits 3 and 6, were performed by petitioners in the capacity of agent for the mutual benefit of the participants in the joint enterprise. For the purpose of the discussion of this point I shall assume that Exhibits 3 and 6 are securities within the meaning of the Act. Later in this opinion it shall be my purpose to show that petitioner did not, as a dealer or otherwise, offer for sale or sell a security.

It is my opinion that the Securities Act, Article 600a, Vernon's Annotated Civil Statutes, now Article 579, Vernon's Annotated Civil Statutes, being penal in nature, should be strictly construed, and unless petitioner has been shown by competent evidence of probative force to have violated some provisions of Article 600a (the law in effect at all times involved herein) he should not be compelled to respond in damages and it should be held by this Court that respondents were not in a position to maintain the cause of action provided for in Section 33a of the Act. That section reads in part:

"Every sale or contract of sale of any security made in violation of any provision of this Chapter shall be voidable at the election of the purchaser, who shall be entitled to recover from the seller in an action at law, upon tender to the seller of the security sold, in proper form for transfer, together with the amount of all dividends, interest, and other income and distributions received by the purchaser from or upon such security, the full amount paid by such purchaser for such security, with interest from the date of purchase; * * *."

Let us assume that Exhibits 3 and 6 are securities within the meaning of the Act, then the question arises: Did petitioner violate any provision of Article 600a which would give rise to the cause of action alleged by respondents under Section 33a of the Act, or was the entire transaction a joint business adventure. If the latter is the true status of the relationship between the parties, then, granting that Exhibits 3 and 6 are

securities within the meaning of the Act, the respondents should not be allowed to recover under Section 33a of the Act. A joint adventure under such circumstances cannot resort to the statutory remedy, but this does not mean that a joint adventurer is without a remedy in the event of the violation of his legal rights by one or more members of the group.

In the case of Jackson v. Clemson, 156 Atl. 540, 103 Pa. super. 39, the Court held that the parties to the contract were co-adventurers, and then quoted the following from the case of Jones v. Kinney, 146 Wis. 130, 131 N.W. 339:

"Where several persons, by common agreement, join as buyers of property, each to acquire a fractional, undivided interest therein, proportionate to the amount paid in by him, they owe to one another in such enterprise the duty of good faith and full and fair disclosure, and neither one can, by secret commission or rebate, obtain any advantage over his co-adventurers. The contest of each is usually given, and the money of each obtained, upon the understanding and belief that the funds, interest, and aid of each is and will be given to the enterprise, within the bounds agreed upon. For one, by secret treaty with the seller, to obtain a commission or rebate is a fraud upon his fellow buyers."

I cite these two cases particularly to support my contention that petitioner and respondents were joint adventurers in the present case. In the Jones v. Kinney case, supra, the facts justified the court in classifying the parties as co-adventurers or joint purchasers, in a common enterprise. The facts were: "It was understood between the plaintiff, defendants and others that they were all going in together to purchase a certain leasehold on a ratable basis; that is, each would receive in the property purchased, to be later represented by shares of corporate stock, a fractional interest in proportion to the amount of his contributions to the purchase money."

The court after stating the general rule first above quoted said:

"We find no support in law for the ruling of the court below that one of *several joint purchasers* may securely withhold his share of payment, yet acquire an interest in the purchased property and commit no fraud, * * *." (Emphasis added).

In the case of Wardowski v. Guardian Trust Co., 262 Mich. 422, 247 N.W. 908, the Court said:

"It is not a violation of the 'Blue Sky Law' for several persons to join and furnish, proportionately, parts of the purchase price of real property to be held for their benefit by a trustee. *Sales of units by such a syndicate, after organization, cannot be made without compliance with the* 'Blue Sky Law.' * * *" (Emphasis added).

In the case of Hathaway v. Porter Royalty Pool, 296 Mich. 90, 295 N.W. 571, the plaintiff cited the case of Smith v. Fishback, Tex. Civ. App., 123 S.W. 2d 771, writ refused, in support of their contention that the agreement involved in the Hathaway case was in violation of the Securities Act. The Court in declining to follow the case of Smith v. Fishback, supra, pointed out that joint adventure was not relied upon as a reason why the Securities Act should not apply. The Court said: "However, it does not appear in the cited case that a joint adventure was relied upon as the ground of distinguishing the relationship from from a sale of securities. That question has been submitted and argued in all of the cases in which this Court has held that a joint adventure does not come within the Blue Sky Law, and it has been insisted in these controversies on the part of those seeking to cancel such agreements, that our statute did not make an exception in such a relationship, and that the provisions of the Act were applicable thereto. This Court, however, has clearly held that a joint adventure is not within the statute, as it existed at the time the agreement in question was entered into. Whether the Texas courts would so hold we do not know. In the cited case the question was not determined. In the instant case joint adventure constitutes practically the entire contention of defendants."

The Michigan statute under consideration in the Hathaway case, supra, was very similar in terms to our Article 600a, the Texas Securities Act, which was in effect at all times involved in this controversy. For example, the Michigan statute defined "securities," "seller," "salesman," and "dealers," in very much the same language as here, yet the Court held in every case where joint adventure was relied upon to distinguish the relationship from a sale of securities, that even thought the Michigan statute did not make an exception (just as our Texas Securities Act) in such relationship, an examination of the authorities in other jurisdictions revealed that the Courts have determined the question of joint adventure upon the facts in each particular case.

The Hathaway opinion was written in 1941, and at that

time the court considered the legal concept of joint adventure of modern origin. The opinion contains a quotation from 30 Am. Jur. 676, as follows:

"The now widely recognized legal concept of joint adventure is of modern origin. It has been said to be purely the creature of the American courts. The early common law did not recognize the relationship of co-adventurers unless the elements of partnership were disclosed and proved, but it is now generally understood that two or more persons may, by combining their property or labor in a joint venture, create a status which, while having some or many of the characteristics of a partnership, is not identical therewith."

The court continued:

"Syndicates, like joint adventurers, have only comparatively recently been brought into notice as subjects of legal consideration. They have generally been regarded subject to some exceptions, as falling within the rules applicable to partnership. In some aspects, they seem to be even more closely related to joint adventures * * *."

"On the whole, however, it must be said that Courts have not laid down any very certain, satisfactory or all inclusive definition of a joint adventure, nor have they established any fixed or certain boundaries thereof, but in most cases, they have been content to determine merely whether the given or conceded facts in the particular case constituted the relationship of joint adventures. 30 Am. Jur. 678. See State Ex rel. Ratcliffe v. Superior Court for Whitman County, et al., 108 Wash. 443, 184 P. 348. 'Joint Adventure' has been defined * * * as an association of two or more persons to carry out a single business enterprise for profit, Fletcher v. Fletcher, 206 Mich. 153, 172 N.W. 436. It is said, for instance, that such an enterprise differs from a partnership because it relates only to a single transaction * * *; and that a joint adventure is distinguishable from joint ownership and tenancy in common because the latter lacks the feature of adventure, Bond et al v. O'Donnell, et al., 205 Iowa 902, 218 N.W. 898, 63 A.L.R. 901.

\* \* \*

"It can be said that a joint adventure contemplates an enterprise jointly undertaken; that it is an association of such joint undertakers to carry out a single project for profit; that the profits are to be shared, as well as the losses, though the

liability of a joint adventure for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract, * * *. There must be a contribution by the parties to a common undertaking to constitute a joint adventure * * *; *and a community of interest* as well as some control over the subject matter or property right of contract, Griffiths v. Van Herberg, et al., 99 Wash. 235, 169 P. 587; Darling et al v. Buddy et al., 318 Mo. 784, 1 S.W. 2d 163, 58 A.L.R. 493.

"Whether the parties to a particular contract have thereby created, as between themselves, the relation of joint adventurers or some other relation, depends upon thir actual intention, Reid v. Shaffer, 6 Cir. 249 F. 553, and such relationship arises only when they intend to associate themselves as such, Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599. This intention is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts. Gleichman v. Famous Players—Laskey Corp. (1928) 241 Mich. 266, 217 N.W. 43."

It has been held that to constitute a joint adventure the parties must combine their property, money, efforts, skill or knowledge in some common undertaking and the contributions of the respective parties need not be equal or of the same character but there must be some contribution of something promotive of the enterprise.

It is generally held that one joint adventurer may be entrusted with the actual control of the enterprise without changing its status as a joint adventure. In such a situation it seems to me that the right to control does not mean that each party has the right to interfere at will with one to whom the group has entrusted the duty of performing acts in the capacity of agent for the group so long as he performs such acts in accordance with the agreement and understanding between the parties. The majority seems to hold that the element of equal joint control must exist before the undertaking in this case can be classed as a joint adventure, and that in order for the element of joint adventure to be present there must be proof that petitioners or respondents or others of the group were officers or directors of Industrial Ores de Mexico or exercised some authority over its operations. In my opinion, the element of control has nothing to do with determining whether or not the facts in this case show that the petitioner and respondents together with others entered into an agreement to first advance

a loan to Howard Fields in Mexico, and the group to be later repaid this money in the form of stock in the corporation to be organized and known as Industrial Ores de Mexico. It is equally true that the element of control can have no bearing on the questions I shall later discuss and that is whether or not the petitioner sold or offered for sale "securities" as defined in the Securities Act.

The majority, it seems to me, has reached its conclusion that joint control must be shown before there can be a joint adventure in this case by applying the well recognized principle of law announced in personal injury suits brought by an occupant of a car against the owner of a car, and the cause of action being based on alleged acts of negligence of the driver of the car. The question in such cases usually is: Does the evidence warrant a finding that the relation was that of joint adventure, or does the evidence establish as a matter of law that the relation was one of host and guest. In such cases in order to establish the relation of joint adventure the evidence must show as said in Carboneau v. Peterson, 1 Wash. 2d 347, 95 P. 2nd 1043, 1055, that "The relationship must possess the element of equal right to a voice in the manner of performance of the enterprise. By this is meant that each of the parties has an equal right in the management and conduct of the undertaking, and that each may equally govern upon the subject of how, when and where the agreement shall be performed. If the will or pleasure of one party is to control the others in these respects, there is no joint adventure. As a corollary to the preceding requirement, it follows that each party must have an equal right of control over the agencies used. This, of course, does not mean that each has the right to interfere at will with the driver to whom the duty of operating an automobile has previously been intrusted. It does mean, however, that each has an equal right of general supervision over the instrumentality, equal authority in directing how the instrumentality is to be used in the performance of the enterprise, and, likewise, equal responsibility for the manner of such performance." I think the case of Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Texas 475, 191 S.W. 2d 716, cited by the majority, is not in point. That case involved primarily a question of limitation. The court simply held, first, that the Humble Oil & Refining Company and Luling Oil & Gas Company were each corporations, and that under their charters were not permitted to form a partnership. After making the general statement that "The relationship of partners, joint adventure or mining partners being contractual in its nature, whether such a relationship exists generally de-

pends upon the intention of the parties. Where the controversy is between the parties and the parties are corporations, a court would not declare that a *partnership* existed unless that intention clearly appeared, even though the purposes for which the contract was made were fully within the purposes for which the corporations are chartered," the court held that the contract negatived the existence of an intention to create a *partnership* relation between Humble and Luling (Emphasis added). I am convinced that the result reached in that case should not be given controlling effect in determining the intention of the parties involved in the present case.

The majority holds in effect that the element of community of interest is lacking and that for that reason the relation between the parties is not that of a joint adventure. Here again, to determine this question we must look to the record. I realize that proof of a common objective or purpose alone is not proof of a community of interest. Community of interest in the performance of a common purpose is usually connected with the purpose to be accomplished but it is nevertheless a distinct factor. As was said in the case of Carboneau v. Peterson, supra, "The parties may have a common objective or purpose, and still a community of interest may be lacking. For instance, two parties may be engaged in the performance of a purpose or object, which may be for the sole interest or advantage of one, and from which the other is to derive no benefit whatever, or the interest of the one may be different and distinct from that of the other. In either of such cases there would not be a joint adventure. The term 'community of interest' as applied to the relation of joint adventure, means an interest common to both parties, that is, a mixture or identity of interest in a venture in which each and all are reciprocally concerned and from which each and all derive a material benefit and sustain a mutual responsibility."

The respondents rely very strongly on the cse of Chambers v. Beckwith, 247 Mich. 255, 225 N.W. 605, and the majority cites the case in support of its holding that petitioner was engaged in an unlawful enterprise, and, therefore, had violated the Securities Act. That case has no application to our case. The Court held in that case that the defendants were engaged in a common enterprise which was unlawful, and that the common enterprise was the sale of unapproved stock. One of the defenses was that the plaintiff had signed a subscription to the stock of a company prior to its organization. The plaintiff denied. The Court held that under the Michigan statute the taking of sub-

scriptions for the purchase of unapproved stock was an offense, and that if defendant actively participated in the transaction the fact that the plaintiff signed the subscription for the stock before the organization of the corporation would not excuse the defendant.

The court then proceeded to a decision of the main question in the case which was: Did the trial court err in refusing to instruct a verdict for the defendant and having so refused, was it error to instruct the jury, as the trial court did in its charge, that "If defendant participated in the sale of the stock, aided and abetted in its sale, he was liable?" The court held that the defendant was liable, this on the theory that the group of which the defendant was a member, was engaged in an unlawful enterprise and that the defendant actively assisted in the common enterprise, which was the sale of the stock.

This leads to a discussion of the question of whether or not any evidence of probative force was introduced in our case to support a finding either express or implied that the petitioner was a dealer in securities, as the term "securities" is defined in the Act. The majority opinion assumes that Brown was a dealer because it was admitted that Brown had not registered as a dealer. The majority then assumes that the only "question here presented for determination is whether or not petitioner Brown made a sale of 'securities' to the respondents." I contend that there is no evidence of probative force in this record that Brown was a dealer. The fact that Brown was not licensed as a dealer is not proof that he was in fact a dealer. In order for the Act to have been violated, it would have been necessary for the respondents to plead and prove that Brown was a dealer as that term is defined in Section 2(c) of Article 600(a), Vernon's Annotated Civil Statutes. The respondents plead that Brown was a dealer in securities, and it is my contention that the establishment of the fact that Brown was a dealer was a condition precedent to recovery under the pleadings as well as the law. The question of whether Brown was a dealer was a question of fact to be determined by the jury. See Ex parte Price, 210 S.W. 2d 152; Winslow v. Boyd, 195 S.W. 2d 384; Fowler v. Hults, 138 Texas 636, 161 S.W. 2d 478. The case was withdrawn from the jury and decided by the Court. It could be argued that we have an implied finding by the trial court that Brown was a dealer under the Securities Act. However, I do not understand the majority to put its holding on that basis. If the majority should contend that the trial court impliedly found Brown to be a dealer under the Act, then, I say there must be

evidence in the record to support such an implied finding. There is none. All the evidence shows that the petitioner and respondents were engaged in a joint venture. The doctrine of joint adventurer is an implied exception. There is no statutory basis other than the Act was not meant to be applicable to such a situation. If the implied exception is applicable, then you do not even consider the Securities Act. For example, if Brown was not a dealer in securities there would be no need to meet the requirements of Section 5 of the Act since that Section, by its terms, is applicable only in the event Brown was a dealer. My contention is that respondents have failed to prove two essential elements, (1) that Brown was a dealer, and (2) that he was a dealer in securities. Failure to prove either of these facts precludes a recovery against Brown.

The record which I shall detail later, shows conclusively that the petitioner and respondents, together with other members of the group, were engaged in a lawful joint enterprise and that petitioner was guilty of no act in violation of Art. 600a, which would authorize respondents to invoke the remedy provided under Section 33a of the Securities Act. Petitioner was not engaged in the sale of stock either alone or as a member of the group. Neither was he soliciting subscriptions for the purchase of stock. The cases relied upon by respondents are those such as Chambers v. Beckwith, supra, wherein it was held that the sale or offer for sale of unregistered stock of a corporation was unlawful. That case cites the case of Edward v. Ioor, 205 Mich. 617, 172 N.W. 620, 15 A.L.R. 256. I desire to analyze this case in order to demonstrate that the case at bar does not fall within the same category and is not controlled by the type of cases cited by respondents. Plaintiff, Edward, purchased through the Michigan Securities Corporation 500 shares of stock of the United Vending Company. He also purchased from defendant, Ioor, 27 shares of stock in the Illinois Piano Company. Defendant, United Vending Company, was an Arizona Corporation. It had been authorized to sell its stock in the State of Michigan, but had not complied with Act. 206, Public Acts 1901, as amended by Act. 310, Public Acts 1907, known as the Foreign Corporation Act. Defendant, Illinois Piano Company, had complied with the Foreign Corporation Act, but had not complied with the Commission (Securities) Act. Defendant, Arizona Piano Company, had complied with neither Act. Plaintiff exchanged his United Vending Company and Illinois Piano Company stock for Arizona Piano Company stock. The court held that such exchange constituted an unlawful sale of stock on the part of the Arizona Piano Company and that plaintiff had the right

to rescind the sale and recover the consideration paid. In so holding the Court said: "It could not lawfully sell its stock without being authorized so to do by the Commission. Under evidence in the case it was selling its stock, not only to plaintiff, but also to many others. It was engaged in the business of disposing of its stock by continued and successive transactions. The sale, and it was a sale as we have seen, of its stock to plaintiff and others was in violation of the Act, and submitted all connected therewith as vendors to the penalties for its violation. * * * This sale to plaintiff of the stock of the Arizona Piano Company was in conflict with the terms of a penal statute, * * * and void, * * *."

Respondents apparently realized in the trial of the case at bar that it was essential to recovery that they establish that Industrial Ores D'Mexico had not been authorized by the Securities Commission of the State of Texas to sell its stock in this state, and that petitioner was a dealer and that the transaction was in violation of the Act.

Petitioner testified in response to questions by attorney for respondents:

"Q: Anybody interested in the putting together of the deal or the selling of the stock or anybody interested in the organization of the corporation—was any application ever made to the Secretary of State for approval of the sale of the stock in Texas? "A: Not that I know of.

"Q: Now then, Mr. Brown, I will ask you this * * * was the stock of Industrial Ores D'Mexico ever contained in any list from the Securities Department or Secretary of State of the State of Texas, as being stock authorized to be sold in Texas?

"A: Not to my knowledge."

I will grant that if the group was actually engaged in the sale or was soliciting subscriptions for the purchase of unregistered stock of the corporation, Industrial Ores D'Mexico, the authorities relied upon by respondents would be controlling and any person acting as a vendor of such stock would be subject to the strict provisions of Section 33a of the Securities Act. However, in the event the evidence shows that a group entered into an agreement to sell unregistered stock each member of the group would be subject to the penal provisions of the statute, and could be held liable in damages under the pro-

visions of Sec. 33a in any suit brought by a purchaser of the stock, but one member of the group so engaged could not possibly have a cause of action against another member of the group under Sec. 33a.

It is my contention that assuming Exhibits 3 and 6 are securities within the Act, and especially Sec. 33a thereof, the respondents still cannot recover against petitioner for the reason that under the evidence most favorable to respondents they joined with petitioner and others in forming a group to lend money for profit, and no sale or offer of sale has been shown to any member of the public outside of the group. The dominant purpose of the Securities Act is for the protection of the public. The law was enacted and its chief object was to regulate the sale of securities and to protect the public from fraud and imposition by those engaged in selling worthless securities.

Neither petitioner nor respondents in our case were required to register under the Securities Act either as a dealer or salesmen before or after entering into the agreement to lend the aggregate sum of $30,000 to Fields of Mexico. The group could have agreed to accept repayment in chips and whetstones; but, instead the repayment of the loan was to be in the form of stock certificates to be issued by Industrial Ores D'Mexico. The evidence is conclusive that this corporation was born as the result of the joint creative effort of the group of which respondents were active participants and that the motive of each was to earn a prolt. Obviously each appreciated the fact that a loss could be incurred.

EXHIBITS 3 and 6 are not Securities

Under the arrangement, as is fully shown, I think, by the memorandum of agreement, Exhibit A, and all the evidence, there is no evidence in this record that Exhibits 3 and 6 constitute securities as defined by the Act. In making this declaration, I am not unmindful of the fact that the definition of "security" or "securities" as set out in Sec. 2 of the Act, contains the phrase "or other evidence of indebtedness." It is upon that part of the definition that respondents pitch their case. The respondents have successfully agreed thus far that plaintiff's Exhibits Nos. 3 and 6, which are exact duplicate letters, one addressed to respondent, Gould, and the other to respondent, Cole, constitute evidence of indebtedness as defined in the Act, and therefore are in law securities. This deduction is wholly untenable and if the construction given these letters by the majority is

upheld then I say that any businessman or financier must refrain from making the slightest suggestion to his friends that it would ultimately be to his financial advantage to advance a loan to a citizen of Texas or Mexico or any other place, and especially would it be dangerous to form a group or syndicate for that purpose, and more especially so if he happens to be a reputable licensed salesman and has been designated by the group to act as its agent, as was the petitioner. The letter which has been held to be a security by the majority appears on page 2 of the majority opinion.

It is my contention that plaintiff's Exhibit No. 1, and being also Exhibit "A" attached to respondents' pleadings, is not and was not a circular advertisement, pamphlet or prospectus, used by petitioner in connection with the sale of a security, but was only a memorandum prepared by petitioner at the request of a member of the group, and was not used in violation of Section 23 of the Act, as charged by respondents. That this is true is shown by the testimony of Mr. Brown as follows:

Questions by Attorney for Respondents:

"Q: Now, Mr. Brown, I believe you said you prepared this memorandum? (Exhibit 1 or A).

"A: Yes, sir, I prepared it.

"Q: All right, and the memorandum was prepared, together with numerous copies of it, to distribute to various parties who might be interested in making an investment in the deal. Isn't that correct?

"A: No, sir.

"Q: What was the purpose of preparing it then?

"A: It was for my own information.

"Q: Why did you prepare several copies?

"A: These people asked me to handle the details * * *.

"Q: What people asked you?

"A: The people who were interested in it. Mr. Samuel

asked me to prepare something; Mr. Wythe asked me to prepare something and so did Mr. Ivey."

These men were in the group before the memorandum was prepared. An original and three copies were prepared. Mr. Brown denied that copies were prepared for the purpose of interesting anybody to invest, but testified that it was prepared at the request of those who were in the group before Mr. Gould and Mr. Cole joined in the project or venture.

Mr. Brown admits that he told Mr. Gould about the matter and gave to him a copy of the memorandum. Mr. Gould, incidentally, was constantly looking for opportunities to make money. He testified that he usually had lunch with a Mr. Sanger, an employee of Beer & Co., one of the defendants in this suit, and that he traded with Mr. Sanger in playing the stock market; that first, Mr. Sanger was with Southern Brokerage Company in this city (Dallas); and I followed him to Hutton & Company and then I followed him to Beer & Company."

The latter company was a party defendant in this suit, but judgment was entered that respondents take nothing as to it. This because of the complete failure to connect the company with the transaction. It was on the occasion of one of Mr. Gould's pre-luncheon visits to his friend, Mr. Sanger, that petitioner mentioned the matter to Mr. Gould of lending $30,000 to Mr. Fields, and it was at that time the memorandum was given to Mr. Gould. Mr. Gould knew Mr. Brown but, I conclude, from the testimony that he was not as close to Mr. Brown as he was to Mr. Sanger. In fact, although Mr. Sanger was a member of the group, and apparently had full knowledge of the matter and was working in the same office with Mr. Brown, and Mr. Gould was sitting at Mr. Sanger's desk when the loan of $30,000 was first mentioned to Mr. Gould, the respondents did not choose to include Mr. Sanger as a party defendant, but selected Beer & Company and Mr. Brown to be defendants, perhaps on the theory that the act of Brown was the act of Beer & Company, and because Mr. Brown was the first of the group to mention the matter, and further they would be able to introduce the letters, plaintiff's Exhibits 3 and 6, and claim that such letters were evidence of indebtedness and, therefore securities. The memorandum corroborates the testimony of Mr. Brown on the question as to why and when it was prepared and more important it shows that the sole purpose of the group, including Mr. Brown, was to lend money and not to sell stock. The memorandum reads in part: "In order to implement this

project the Dallas group (this means Gould, Cole, et al) has loaned Mr. Kane $30,000 for 6 months at 5%. Mr. Kane has formed a corporation called Industrial Ores de Mexico with a capital of $30,000 shares, 1 peso per common, 270,000 preferred, 1 peso per capital variable; 7/8th of the stock of this corporation will be put in escrow for the benefit of the Dallas associates and 1/8th will go to Mr. Kane which was our agreement with him when we asked him to take over this project. Mr. Kane will make the $30,000 loan to Mr. Fields' corporation, Carbo Minera. Carbo Minera will immediately convey 25% of its stock to Industrial Ores de Mexico and the balance of 75% common stock will be placed in escrow in a bank to secure the $30,000 loan. Mr. Fields will receive a salary of $500.00 per month until the indebtedness has been paid and the corporation will be required to keep a minimum of $15,000 working capital on hand. Mr. Kane has the right to take over Carbo Minera any time the monthly payments on this loan are in default."

Another paragraph of the memorandum which convincingly shows that this transaction was a joint enterprise and not the sale of a security in violation of the Act is the following:

"Fausto Miranda of Baker, Botts, Miranda & Priesto, *our attorneys,* called from Mexico City June 20 and stated that he had investigated the Fields' property through American Smelting & Refining and has worked out all corporation details on both corporations and to him the project appeared to have substantial safety and excellent prospects."

The memorandum goes on to say: *"We* plan to send Mr. Kane a total of $35,000. This will leave an excess of $5,000 in the Industrial Ores de Mexico for legal and other expenses. This money is a loan and will come back to the Dallas associates tax free. *We have* placed Mr. Kane on a retainer of $1,000 per month and all his services will be for the benefit of Industrial Ores de Mexico; the 7/8ths of Industrial Ores will go to the Dallas syndicate on the ratio of 1/8th for each $5,000. Mr. Kane will supervise the Carbo operation, collect and bank the funds each month. All fees for services performed by Mr. Kane or interests in properties received by him for services after the formation of Industrial Ores de Mexico will be for the benefit of Industrial Ores de Mexico. After the $30,000 is returned and all indebtedness is paid, the property should pay approximately $4,000 to $5,000 monthly to the 1/4th interest."

Under all the facts and circumstances Mr. Brown, in writing

the letters (plaintiff's Exhibits 3 and 6) was, as a matter of law, acting in the capacity of agent for the group, including respondents, in accepting funds and forwarding them to Mexico, and the paragraph that refers to the stock merely reaffirms the understanding as to the manner of repayment of the loan. The letters are not securities and the trial court erred in refusing to grant petitioner's motion for instructed verdict.

I have examined such cases as Thompson v. Cain, 226 Mich. 609, 198 N.W. 249 (cited in Chambers v. Beckwith, supra); Securities Exchange Commission v. W.J. Howey Co., 328 U.S. 293; 66 Sup. Ct. 1100, 90 L. Ed. 1244; State v. Gopher Tire & Rubber Co., 146 Minn. 52, 177 N.W. 937, all of which are relied upon by respondents to support their position. I shall not attempt to analyze these cases, as well as others cited by respondents, as well as the Court of Civil Appeals and the majority. It is sufficient to say that in my opinion they have no application to the case at bar.

The majority holds that "the seller may be any link in the chain of the selling process or in the words of the Act he is one who performs any act by which a sale is made." If we accept this stattment, then it is my contention that Gould is a seller as well as Brown and should not be allowed to recover against Brown. Gould, not Brown, mailed or delivered the socalled prospectus to Cole, etc. It seems to me that as a matter of law we should at least reverse and render the judgment so far as Gould is concerned.

The judgment of the trial court and the Court of Civil Appeals should be reversed and judgment here rendered that respondents take nothing.

Opinion delivered June 20, 1956.