**J. Howard SMITH, Appellant,**

**v.**

**J. Allen SMITH, Appellee.**

**No. 15189.**

Court of Civil Appeals of Texas.

Houston.

Jan. 18, 1968.

Rehearing Denied Feb. 8, 1968.

White & Wallace, James P. Wallace, Houston, Hester & Toscano, Harlingen, for appellant.

Tom W. Foster, Houston; Talbert, Giessel, Barnett & Stone, Houston, of counsel, for appellee.

PEDEN, Justice.

This cause was brought by the appellee to recover $25,000.00 (less $1,250.00, returned to him as income) which he paid to his brother, the appellant, under circumstances which appellee asserts amount to a sale or an offer for sale of unregistered securities by an unregistered seller in violation of the Civil Liabilities Section of the Texas Securities Act, Article 581–33, Vernon's Ann.Civil Statutes. Appellant denies that he made a sale and contends he was acting only for appellee.

The trial court entered a judgment non obstante veredicto after receiving a jury verdict which included findings that (1) appellant did not offer for sale, sell or make a sale of the securities in question to appellee, and (2) that in the transaction in question appellant was acting solely as an agent for appellee.

The testimony shows that before the transaction in question arose, the parties had often discussed their investments when they met and when they corresponded. In April, 1963, appellant wrote a letter to each of his sisters and to appellee discussing matters of family interest and then describing in detail what was pictured as an attractive investment opportunity, stating as follows:

"There's something I want to tell you about concerning a private investment opportunity that you may wish to consider. I am acquainted with several members of a private investment group who pool their money—and that of others—and purchase discounted retainage certificates of highway contractors. These are the certificates issued to contractors after their jobs have been inspected and accepted. Usually, the amount of the certificate represents the final 10% the State owes the contractor (probably most of his net profit) and the term of the certificate is 75 days.

"As you know, contractors are bonded for these jobs by a performance bond

issued by an insurance company. The contractor must be bonded for each job before it can be awarded to him. To get a bond, the contractor must have an audit, and the audit must show a certain required amount of liquid capital over and above any indebtedness. If contractors worked regularly all year around as in some business there would probably seldom be any need for them to discount their certificates to obtain liquid capital. But they don't. Roughly 80% of their year's business is jammed into a 6-months period; they may have jobs going and opportunities for a sixth and seventh job pending.

"In order to get an acceptable bond they must show one dollar fo– free liquid capital for every ten dollars face-amount of the bond they require. With a number of jobs under way this may not be possible, even for large contracting firms, because their capital is spread over a number of current jobs. They may have considerable money due them in the form of these certificates, but since retainage certificates do not involve liens or other form of guarantee, they aren't accepted at banks—at least under Texas banking laws. So the contractors have to turn to private sources for immediate realization.

"The principal, or operating member, of the group I am acquainted with has been a bonding agent for an insurance company for more than fifteen years and has a large and very profitable business in this field. The group itself is now in its tenth year of operation. With one exception, all members are kin by blood or marriage.

"The group has the contractor place his certificate and allied papers with the trust department of a designated bank, making an assignment on the envelope to them, and then authorizes him to draft on their fund for the discounted amount. The usual term that the group holds such papers is 3 – 6 weeks as the contractors pay lesser discounts for shorter terms. In order to maintain their financial relationship with the contractors (essentially, to keep the bonding and discount business from going elsewhere) the group must be prepared to meet any demand for capital under this arrangement their participating contractors make. This means they must frequently seek outside capital for their fund. I have been told that the fund averages around $2 million and that there are some ninety contractors in four states participating).

"At these times the members of the investment group offer to outside investors personally known an opportunity to participate. Those who are interested notify them of the amount they can commit and the date they will be prepared to do so. Usually, this amount will be called for within 10 days after that date, as the need arises. The principal then issues a note on the fund for the amount you invest and the group member, in turn, issues you an investment participation agreement instrument. Accounting is handled by a C.P.A. In particular, they are seeking investors who can offer $10,000 or more capital, as they wish to keep the total number participating as small and as manageable as possible.

"Whenever the certificate in which you are participating is tendered for payment by the trust department of the bank at the end of its term, your capital amount is refunded plus $40 per thousand invested. This works out to a capital return of $40 per thousand per month, sometimes a little more if the term is shorter. You may call this 4% per month, but *note* that it is capital gain and not interest. My present return is $2000 per month, a short-term capital gain.

"I first learned about this last year. The brother of a friend down here is one of the early members of the group,

and he is now a member, too. There will be calls on him to obtain additional capital and there will be an opportunity for each of you to participate, if you wish, beginning probably in August. My guess is that between August and the 3nd of December you may have an opportunity to get a total return of as much as $10,000 on $50,000 investment because of the turnover rate that usually prevails during this period. Also, the group may need additional permanent capital for growth and there may be an opportunity to place your investment at the same rate regularly per month."

Before and during the summer of 1963 appellant had been dealing with "the principal, or operating member of the group," who was Paul Sandblom of Corpus Christi, through a Dr. Meadows. Dr. Meadows was receiving funds from more than a hundred investors and had sent the funds on to Sandblom, who issued promissory notes to Dr. Meadows at a rate which was 1% higher than the return specified in participation agreements which Dr. Meadows then issued to the individual investors. Dr. Meadows proposed that appellant take over some of the accounts. Appellant considered doing so. He opened a bank account in the name of "The Howard Association" and consulted his attorney about the problems involved. He got the privilege of dealing directly with Sandblom and receiving the same 1% return as Dr. Meadows, but it has not been established that he ever discussed the investment opportunity with prospective investors outside his family or that he ever received any sales commission.

Meanwhile, in appellee's reply to appellant's letter as set out above, appellee expressed interest and asked for more information about the investment opportunity. Appellant, after discussing the matter with Sandblom and learning that Sandblom wanted additional money, called appellee by telephone and told him how much Sandblom had said he could invest and that

appellee's return would be at the rate of 5% each 25 days for a total return of 15% on his $25,000.00 in 75 days. Appellee then (on September 6, 1963) sent to appellant his check for $25,000.00 made payable to appellant. Appellant testified that he had arranged for appellee to send it direct to Sandblom, but that he deposited this check in his account in the name of "The Howard Association," then transferred the $25,000.00 together with a $4,000.00 investment of his own to an account of Sandblom's in Corpus Christi. Appellant testified further that after some delay he received from Sandblom two promissory notes payable to himself and his wife, one for $25,000.00 and one for $4,000.00. He said this was a mistake on Sandblom's part and that he (appellant) repeatedly asked that Sandblom correct the $25,000.00 note so that it would be payable to appellee. Sandblom never did send such correction note, and on November 9, 1963, appellant finally responded to appellee's urgings and mailed to appellee this acknowledgment of the receipt of $25,000.00:

> The Howard Association
> P. O. Box 19–554
> Houston, Texas, 77024
> November 9th, 1963

Mr. J. Allen H. Smith
5005 Gaston Avenue
Dallas, Texas

Dear Allen:

This is to acknowledge that I have received from you the sum of twenty-five thousand dollars ($25,000.00) for investment purposes on September 10, 1963, and did forward same on that date to the principal, who has issued a note for this amount on that date.

The terms of the note state that the term of the note is 75 days and that it is due and payable November 24th, 1963. This note is in my hands and can be seen at the Safe Deposit Department of

the Spring Branch Bank, Houston, 24, Texas.

Yours very truly,

Joel Howard Smith

Appellant further testified that a 5% return was due on or about October 5, 1963, and that about a week later he received an unexplained $3,000.00 check from Sandblom's account; when asked about it Sandblom said it was a partial payment and that he could do with it as he pleased. He sent $1,250.00 of it to appellee by check drawn on "The Howard Association" and kept the remaining $1,750.00. The next event which occurred was the filing by others of bankruptcy proceedings against Sandblom.

■ The evidence and the pleadings show that appellant was not licensed as a dealer or salesman of securities as contemplated by the Texas Securities Act at the time in question; we hold that both the letter of acknowledgment dated November 9, 1963 and Sandblom's $25,000.00 note were securities as defined in Article 581-4(A), Vernon's Civil Statutes.

It is uncontroverted that the securities in question were not registered in compliance with the Act.

We now come to the question of whether it is established by the evidence as a matter of law that appellant offered for sale or sold a security to appellee.

Texas' leading case on what constitutes a sale as contemplated by the Act is the 1956 decision in Brown v. Cole et al., 155 Tex. 624, 291 S.W.2d 704, 59 A.L.R.2d 1011. In that case the trial court withdrew the case from the jury without objection at the close of testimony and entered judgment for the plaintiffs based on their claim that defendant Brown had made a sale of unregistered securities while he was not registered in compliance with the Texas Securities Act, which was then Art. 600a, Vernon's Ann.Civ.St. The Act has since been extensively amended, but the amend-

ments do not affect the outcome of the instant case.

The Dallas Court of Civil Appeals affirmed the judgment of the trial court at 276 S.W.2d 369, and the Supreme Court affirmed the judgment of the Court of Civil Appeals.

The facts concerning the dealings between the parties in Brown v. Cole are quite involved, and a full discussion of them may be found in the Court of Civil Appeals' opinion.

To summarize them briefly, defendant Brown, an employee of a brokerage firm, interested plaintiff Gould in a mining venture in Mexico which needed funds. Brown and others were to participate in making the loan and were to receive proportionate parts of the stock of a Mexican corporation which owned one-fourth of the mining properties involved. Plaintiff Gould interested plaintiff Cole, who sent his auditor to Mexico at defendant Brown's expense to investigate the venture. Cole and Gould sent their checks to Brown, who acknowledged receipt of them and forwarded them to Mexico.

Brown made no commission; he suffered a complete loss of his investment and his statements were not relied on by plaintiffs.

In affirming the judgments of the lower courts in holding that Brown had made a sale as defined by the Act, the Supreme Court pointed out that

"Section 2(e) [now Sec. 4(e)] defines the term 'sale' or ' "offer for sale" ' or 'sell' as including 'every disposition, or attempt to dispose of a security for value', and provides that 'any security given or delivered with or as a bonus on account of, any purchase of securities or other thing of value, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value.' The Act further defines the term 'sell' as meaning 'any act by which a sale is made, and the "sale" or "offer

for sale" shall include a subscription, an option for sale, a solicitation of sale, an attempt to sell, or an offer to sell, directly or by an agent or salesman.'"

The act was amended in 1957 to include in this definition of "sale" or "offer for sale" the solicitation of an offer to buy.

The Supreme Court recited the following factors in its holding that there was a sale:

(1) The fact that Brown was also a purchaser does not ipso facto prevent his being a seller.

(2) There may be more than one seller.

(3) The seller may be any link in the chain of the selling process.

(4) A seller is one who performs any act by which a sale is made.

(5) If sellers had agreed to pay Brown a commission, he would have earned it because his efforts resulted in the participation by Cole and Gould.

(6) Brown was the agent of Cole and Gould in the transmittal of funds, but that was only a part of and resulted from dealings had theretofore with them.

(7) It was through Brown's presentation to Cole and Gould that they became interested.

(8) Brown displayed salesmanship activity:

1. After initial discussions, he wrote sellers for more information.

2. Then Brown called Cole and Gould and gave them information he had received.

3. Trip to Mexico was made at Brown's suggestion and at his expense.

4. But for Brown's activities and repeated efforts the plaintiffs would not have participated in the transaction.

There are, of course, some differences between the facts in Brown v. Cole, supra,

and the facts in this case. In the instant case the parties are brothers. Each had inherited a sizeable sum and was devoting a great deal of time to investing and reinvesting it. Appellee, as the older brother, frequently advised his brother and sisters as to his investment experiences and opportunities. Appellee testified that his conversations with Sandblom were not for Sandblom's interest or his own but were undertaken for his brother to see if he could obtain for his brother the same 1% advantage that appellee and Dr. Meadows had obtained. Appellee testified that his having acted as intermediary in sending appellant's money to Sandblom was done because appellant had asked him to and that he had not anticipated appellant would send the money to him (appellee).

But there is a marked parallel between many of the activities on the part of appellant in the instant case and those of Brown which the Supreme Court recites in upholding the judgment of the trial court in Brown v. Cole, supra, as being salesmanship activities:

(1) Appellant admitted he solicited appellee's participation when he first told appellee about the investment opportunity in the letter set out above; it was through such letter that appellee became interested.

(2) Appellee got all his information concerning the investment from appellant.

(3) Appellant was seriously considering going into the business of selling these investment opportunities for a 1% commission and did (a) set up a bank account for that purpose and (b) consult his attorney about the considerations which would be involved.

(4) The original letter constitutes rather persuasive salesmanship, and it did not give the name of any of the principals whom appellee could contact if he wished to invest; he had to go through appellant.

(5) Appellee asked for more information; appellant got it from Sandblom and gave it to appellee.

■ We feel that these factors are so significant that as a matter of law appellant must be held to have been a link in the selling process despite the jury's findings in Issue No. 1 that there was no preponderance of the evidence that appellant did offer for sale, sell or make a sale of securities and in Issue No. 8 that appellant was acting solely as agent for appellee in the transaction in question. Under the facts of the instant case, the issues are considered together since the appellant's defense of his having made no sale or offer to sell is based on his contention that he was only acting as agent for his brother, the appellee, who was the purchaser.

We overrule appellant's first point.

■ Special Issues 2, 2(a), 3 and 4 (not previously mentioned in this opinion) inquired into alleged misrepresentations on the part of appellant in violation of the Act, and the effect of the jury's answer to Issue No. 4 was to deny to appellee relief based on misrepresentations. In his brief, appellee does not contend that the jury's answers to such issues are not supported by the evidence, and we hold that the evidence does support them.

Appellant's second point of error asserts that Special Issue No. 8, which asks whether he was acting solely as agent for appellee, was supported by his pleading of joint venture. We have ruled that as a matter of law appellant made a sale as defined by the Act, so it is unnecessary to rule on this point.

Appellant's third point says that judgment non obstante veredicto should not have been entered because (1) proper notice of the motion is not recited in the judgment, (2) no appearance of appellant's attorney is recited in the judgment, (3) no facts constituting waiver of hearing on the motion are recited in the judgment and (4) notice of the hearing of said motion is not contained in the motion itself.

■ Appellant makes no claim that he was not present at the hearing nor that he did not receive proper notice. The judgment non obstante veredicto shows on its face that he signed his name just beneath the words "Approved as to form." We hold that this constitutes a waiver of the formal recitals in the judgment as to notice.

For the reasons stated, the judgment of the trial court is affirmed.